643 A.2d 446

William Edward WIELAND, Jr.

v.

STATE of Maryland.

No. 1412, Sept. Term, 1993.

Court of Special Appeals of Maryland.

June 28, 1994.

**4**

[redacted]

Byron L. Warnken, argued (Warnken & Warnken, on the brief), Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen., Baltimore, argued (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Scott G. Patterson, State's Atty. for Talbot County, Easton, on the brief), for appellee.

Argued before MOYLAN, ALPERT and ROSS, JJ., and DAVID, J. (specially assigned).

MOYLAN, Judge.

The appellant, William Edward Wieland, Jr. (Billy Wieland), was convicted by a Talbot County jury of four assaultive offenses, consummated or inchoate, against his brother, Bryan Wieland. The four offenses were part of a single act that took place at approximately 3 A.M. on August 10, 1992, at Billy Wieland's own home on Glebe Road in Easton. Billy Wieland was convicted of 1) the battery of his brother, 2) the antecedent assault, 3) the reckless endangerment of "another person" who turned out to be his brother, and 4) the carrying of a handgun with the intent to injure his brother.

The appellant was also convicted by the same jury of three other offenses that occurred at about 2:30 A.M. that same morning at a nearby 7–Eleven Store in Easton. Those offenses consisted of 1) an assault on Mohammed Khawar Ullah, 2) the unlawful carrying of a handgun at the 7–Eleven, and 3) the unlawful transporting of a handgun between the 7–Eleven and the residence at Glebe Road.

On this appeal, the appellant raises six contentions. They are:

1) that the trial judge erroneously declined to sever the trial of the Glebe Road offenses from the trial of the offenses committed at the 7–Eleven;

2) that the evidence was not legally sufficient to support the appellant's convictions for the four offenses committed at Glebe Road;

3) that the appellant was entitled to a judgment of acquittal on the charge of carrying a handgun at his Glebe Road residence because the provisions of Md.Ann.Code art. 27, § 36B(c)(4) explicitly exempt a homeowner, carrying a handgun in his own home, from the coverage of the criminal offense;

4) that the judge erroneously concluded that he was required to impose a mandatory five-year sentence for the violation of § 36B(b)(iv) and erroneously believed that he lacked the discretion to suspend the sentence;

5) that the trial judge committed plain error in failing to instruct the jury on the possible effect of voluntary intoxication with respect to two offenses that allegedly required specific intent; and

6) that the trial judge gave an inapplicable and, therefore, confusing instruction to the jury on the subject of transferred intent.

### The Incident at the 7–Eleven

Mohammed Khawar Ullah (Khawar) was the victim of the first assault. At approximately 2:30 A.M., he drove to the 7–Eleven where he worked with his brother, Mohammed Amjad Ullah. As Khawar approached the store, he saw Billy Wieland's vehicle moving at a very high rate of speed and feared that it might hit his car. Billy pulled into the parking place next to Khawar and, as he exited his vehicle, his door hit Khawar's car. As Khawar entered the 7–Eleven, Billy was already inside, staring at him in an angry way. Khawar asked

Billy if he was all right. Billy responded, "Yeah, I'm all right—are you all right?" Khawar answered that he was.

At that point, Billy walked backward out of the 7–Eleven, continuing to stare at Khawar. He then challenged Khawar to "come on out, you motherfucker; I've got something for you." Khawar opened the door to the 7–Eleven and told Billy to "go home." Billy then opened his jacket, revealing a gun in the waistband of his pants and saying, "Look, motherfucker, what I got." At that point, Billy got in his car, gunned the engine, sped through the parking lot, and drove away. Khawar stated that Billy appeared to be drunk.

Police were summoned to the scene and took statements from both Ullah brothers. While they were there, Bryan Wieland arrived. He talked briefly with the police and then said that he was going to his brother's house.

### The Incident at Glebe Road

When Bryan Wieland arrived at his brother's house on Glebe Road, the front porch light was on but the lights inside the house were out. Bryan parked in the driveway and walked to the front door. Thinking Billy might be asleep, Bryan kicked the bottom of the front door four or five times, making a lot of noise in the process. When Billy did not answer, Bryan decided to go home. About halfway to his car, Bryan heard a noise inside the house. He walked back to the front door. As Bryan reached the front door, Billy opened it and the gun he was holding fired. Bryan was hit in the left shoulder.

Billy Wieland testified that he is an alcoholic and that on the day he shot his brother, he had been drinking heavily since approximately 2 P.M. He had purchased the handgun for protection of his business and for his own protection when he made night deposits. Billy remembered the trip to the 7–Eleven with the gun in his waistband, but he had no recollection of a confrontation with Khawar. After returning from the 7–Eleven, Billy either fell asleep or passed out on his bed. He was awakened by a loud noise. He testified that because of

the hour and the nature of the loud noise, he removed his handgun from its holster and inserted a clip. He went down the hallway and peered around the corner to see who was at the door. He observed "an unknown person" leaving but then turning as if to return. He did not realize it was his brother at the door until he opened it.

Billy testified that as the door swung open, he took a step backward, tripped, and fell. He claimed that the discharge of the gun was completely accidental. When he gave a statement to Trooper John Bollinger, however, he made no mention of tripping and falling before the shot was fired.

In any event, he was shocked to discover that the person he had hit was his own brother. He rushed to his brother's assistance, grabbed him, and tried to comfort him. He called for emergency medical assistance and told a member of the ambulance crew that he had shot his brother accidentally. Bryan was evacuated by helicopter to the Shock Trauma Unit in Baltimore. The police who arrived at the scene detected a strong odor of alcohol on Billy's breath and observed that he was noticeably slurring his words.

### The Severance Issue

As his trial approached, the appellant was facing a single consolidated criminal information containing eleven counts. The last three of those counts involved the earlier incident at the 7–Eleven. The first eight of those counts involved the later incident at Glebe Road. By virtue of the appellant's motions for judgment of acquittal being granted with respect to two of the Glebe Road counts and *nol prosses* being entered by the State with respect to two other of the Glebe Road counts, the Glebe Road package of charges for purposes of present analysis is reduced to four offenses.

The three crimes charged as having occurred at the 7–Eleven were 1) the assault (of the attempt to frighten variety, not of the attempted battery variety) against Mohammed Khawar Ullah, 2) the carrying of a handgun at the 7–Eleven in

contravention of § 36B, and 3) the largely overlapping carrying of a handgun between the 7–Eleven and Glebe Road.

The episode at Glebe Road gave rise to four charges that resulted in guilty verdicts. They were 1) the carrying of a handgun on the Glebe Road premises in alleged violation of § 36B, 2) the battery of Bryan Wieland at Glebe Road, 3) the antecedent assault on Bryan Wieland which merged into the consummated battery, and 4) the reckless endangerment of "another person" (who turned out to be Bryan Wieland), which also merged into the consummated battery, the harm that had been recklessly risked.

The appellant timely moved to have the two sets of charges severed for trial purposes. He relied on Md.Rule 4–253, dealing with "Joint or Separate Trials." Subsection (a) deals with the joinder for trial of two or more defendants and subsection (b) deals with the joinder for trial of two or more charging documents. It is subsection (c) that deals with the severing of charges and/or defendants who had been previously joined for trial where it appears that prejudice might result from the joint trial. Subsection (c) provides:

> **Prejudicial Joinder.**—If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents, or defendants, the court may, on its own initiative or on motion of any party, order separate trials of counts, charging documents, or defendants, or grant any other relief as justice requires.

The trial judge denied the motion, relying largely on *Tichnell v. State*, 287 Md. 695, 415 A.2d 830 (1980). We hold that, in the circumstances of this case, the denial of the request for trial severance was in error.

## 1. *Severance and Joinder: Two Views of the Same Phenomenon*

As we survey briefly the controlling case law, we note that the cases assume two different procedural postures. Some deal with the opposition to an effort to join charges or defendants that have theretofore been separate. Others deal

with the effort to sever charges or defendants that have theretofore been joined. It is a distinction without a difference. One is simply the procedural converse of the other. The defendant (or the State) either wants to get loose or to stay loose. Whether a party is 1) resisting a proposed joinder or 2) seeking to extricate himself from an already existing joinder, the same principles of law control. As we observed in *Hutchinson v. State*, 41 Md.App. 569, 572, 398 A.2d 451 (1979), *aff'd*, 287 Md. 198, 411 A.2d 1035 (1980).

While the question generally arises in the context of a request by a defendant for a severance, the same principles apply whether the request is for joinder or severance.

### 2. *The Progressive Disappearance of Discretion*

We make one other preliminary observation. Although the cases all do ritualistic lip service to the principle that the decision to grant a motion to sever or to join is one committed to the discretion of the trial judge, *Frazier v. State*, 318 Md. 597, 607, 569 A.2d 684 (1990); *State v. Edison*, 318 Md. 541, 546, 569 A.2d 657 (1990); *Graves v. State*, 298 Md. 542, 544, 471 A.2d 701 (1984); *McKnight v. State*, 280 Md. 604, 608, 375 A.2d 551 (1977); *Kearney v. State*, 86 Md.App. 247, 251, 586 A.2d 746, *cert. denied*, 323 Md. 34, 591 A.2d 250 (1991); *Cook v. State*, 84 Md.App. 122, 129, 578 A.2d 283 (1990), *cert. denied*, 321 Md. 502, 583 A.2d 276 (1991); *McKinney v. State*, 82 Md.App. 111, 118, 570 A.2d 360 (1990), a survey of the decisions themselves reveals that this is an area where the reviewing courts have been far less deferential than in many other areas involving the review of discretionary decisions and, with some regularity, have not hesitated to reverse the decisions of the trial court, showing little or no deference in the process. *State v. Kramer*, 318 Md. 576, 569 A.2d 674 (1990); *State v. Edison*, 318 Md. 541, 569 A.2d 657 (1990); *State v. Jones*, 284 Md. 232, 395 A.2d 1182 (1979); *Lebedun v. State*, 283 Md. 257, 390 A.2d 64 (1978); *McKnight v. State*, 280 Md. 604, 375 A.2d 551 (1977); *McChan v. State*, 238 Md. 149, 207 A.2d 632 (1965); *McKinney v. State*, 82 Md.App. 111, 570 A.2d 360 (1990); *Shingleton v. State*, 39 Md.App. 527, 387 A.2d

1134, *cert. denied,* 283 Md. 738 (1978); *Brafman v. State,* 38 Md.App. 465, 381 A.2d 687 (1978); *Jones v. State,* 38 Md.App. 432, 381 A.2d 317 (1978), *aff'd,* 284 Md. 232, 395 A.2d 1182 (1979).

*McKnight v. State,* 280 Md. 604, 375 A.2d 551 (1977) is the seminal case on severance/joinder. It is also the case that first dramatically narrowed the range of discretion truly available to the trial judge by holding that, in a jury case at least, whenever evidence on separate charges would not be mutually admissible, severance, if timely requested, is absolutely mandated as a matter of law. 280 Md. at 612, 375 A.2d 551. *Graves v. State,* 298 Md. 542, 471 A.2d 701 (1984) was the definitive exegesis of the meaning of *McKnight.* As to the total elimination of discretion on that critical issue, Judge Orth explained, 298 Md. at 545–546, 471 A.2d 701:

> *The McKnight holding took away the discretion of the trial judge* presiding at a jury trial to join similar offenses where the evidence as to them was not mutually admissible. As we have indicated, in such circumstances, *there was prejudice as a matter of law* which compelled separate trials. The rationale underlying the *McKnight* holding was our concern that a jury would be unable to set aside the likely prejudice engendered by the joinder. (emphasis supplied).

In *Kearney v. State,* 86 Md.App. 247, 586 A.2d 746, *cert. denied,* 323 Md. 34, 591 A.2d 250 (1991), Chief Judge Wilner similarly characterized the rule of *McKnight,* 86 Md.App. at 253, 586 A.2d 746:

> [I]n a jury trial, "a defendant charged with similar, but unrelated offenses is *entitled* to a severance where he establishes that the evidence as to each individual offense would not be mutually admissible at separate trials." Indeed, where the evidence at a joint jury trial is not mutually admissible because of "other crimes" evidence, there is prejudice as a matter of law which compels separate trials. (citation omitted) (emphasis in original).

*See also Frazier v. State,* 318 Md. 597, 608–609, 569 A.2d 684 (1990); *State v. Jones,* 284 Md. 232, 239, 395 A.2d 1182 (1979); *McKinney v. State,* 82 Md.App. 111, 119, 570 A.2d 360 (1990); *Samuels v. State,* 54 Md.App. 486, 491, 459 A.2d 213 (1983). The nagging incongruity is that we continue to label the reason for appellate reversal on this issue not "legal error," which it has now indisputably become, but an "abuse of discretion," which it cannot be for there is no longer any discretion to be abused. See, *e.g., State v. Jones,* 284 Md. 232, 244, 395 A.2d 1182 (1979); *Lebedun v. State,* 283 Md. 257, 282, 390 A.2d 64 (1978); *but see Kearney v. State,* 86 Md.App. 247, 254, 586 A.2d 746, *cert. denied,* 323 Md. 34, 591 A.2d 250 (1991).

All that remained discretionary in a jury trial was the referee's call at the second hurdle that the State must clear before a joint trial of separate charges may proceed. Even when evidence bearing on another charge is *prima facie* admissible, the judge still must weigh the probative value of the evidence against the danger of unfair prejudice. *State v. Edison,* 318 Md. 541, 548, 569 A.2d 657 (1990) explained:

> Even though the evidence may fall within one or more of the exceptions of the "other crimes" rule, *the trial judge still possesses discretion* as to whether it should be received. [*State v. Faulkner,* 314 Md. 630] at 640, 552 A.2d 896 [ (1989) ]. (emphasis supplied).

Even as to that residuary discretion, however, *State v. Edison* proceeded to narrow its range yet further. " 'The leeway of this discretion lies in the direction of excluding otherwise admissible evidence.' " 318 Md. at 548, 569 A.2d 657, *quoting State v. Faulkner,* 314 Md. at 641, 552 A.2d 896. In addressing the severance problem before it, the Court of Appeals acknowledged that it was dealing with evidence that was otherwise admissible so that only the discretionary weighing process remained to be examined:

> We shall assume, for the purpose of decision, that the requirement of the first step—whether the evidence that relates to an offense separate from the offense the defen-

dant is presently on trial—here fits, as a matter of law, within one or more of the exceptions to the general "other crimes" rule.... With the exception of [one] charge, a scanning of the evidence adduced readily shows that it was clear and convincing with respect to Edison's involvement in the other charges in the indictments. So this appeal settles down to the requirement of the third step. Even if the requirements of steps one and two are satisfied,

> [t]he necessity for and probative value of the "other crimes" evidence is to be carefully weighed against any undue prejudice likely to result from its admission. ... This requirement "implicates the exercise of the trial court's discretion." (citations omitted) (emphasis supplied).

318 Md. at 561–562, 569 A.2d 657.

What the *Edison* case then did, under the guise of reviewing four allegedly discretionary weighings of probative value versus unfair prejudice, was a strange hodgepodge of analysis. Three separate crimes on three separate occasions had been joined for trial. Each, to be sure, threw some light on the others. Agreeing that at least *skeletal* references were mutually admissible, *Edison* could be interpreted as holding simply that more elaborate and embellishing detail of the respective crimes was, however, surplusage and that the excessive detail was not mutually admissible. 318 Md. at 564, 569 A.2d 657. Under such a reading, the *decision* would be sound, for a determination based on the absence of mutual admissibility, even limited to the non-admissibility of the excessive detail, is a legal decision and not a discretionary call. *McKnight v. State,* 280 Md. 604, 375 A.2d 551 (1977); *Graves v. State,* 298 Md. 542, 471 A.2d 701 (1984). The *opinion* in *Edison,* however, as opposed to the *decision* in *Edison,* continued to speak the language of reviewing exercises of discretion by the trial judge:

> We are constrained to conclude that the trial judge did not heed our caution set out in *Faulkner* that *in his judicious determination* of the probative effect of the evidence versus its prejudicial impact, *he must weigh carefully*

the necessity for and probativeness of the evidence concerning the collateral criminal acts against the untoward prejudice which was likely to be the consequence of its admission. . . . The necessity for and the probative value of the improper evidence was far exceeded by potential jury hostility or unfair prejudice. (citation omitted) (emphasis supplied).

318 Md. at 564, 569 A.2d 657. In four out of four instances, the *Edison* court then almost summarily declared the rulings of the trial judge wrong, without any reference to or language about discretionary range or about the deferential standard of appellate review ordinarily employed when looking at discretionary decisions. It seemed to apply a rigid right/wrong standard even while continuing to speak the language of discretionary review. It may simply be the case that the decision is sound but that the opinion announcing the decision is treacherous.

It is interesting to note that in a court trial, by contrast, the judge has significantly more discretion on the severance/joinder issue than is permitted in a jury trial. *Graves v. State,* 298 Md. 542, 471 A.2d 701 (1984) is the authority for this dichotomy. "What our opinions do . . . is to effect a distinction between a trial with a jury and a trial without a jury with respect to the court's discretion in the context of prejudice by a joinder." 298 Md. at 544, 471 A.2d 701. Even when evidence is not mutually admissible, a situation where no discretion exists and where trial severance is absolutely mandated in a jury trial as a matter of law, the judge may nonetheless order a trial joinder in the interest of judicial economy for a court trial. The rationale for the significantly greater latitude—to wit, the discretion—is that the legally trained judge can weigh the factors of efficiency and economy against the possible prejudice to his own impartiality and can give reasonable assurance that his fact finding will be (or has been) meticulously segmented into watertight compartments, hermetically sealed off from any spill-over influences. *Graves v. State* recognized the fundamental difference between the types of fact finder, 298 Md. at 546, 471 A.2d 701:

The rationale underlying the *McKnight* holding does not support the application of that holding to a court trial. *We have noticed a fundamental distinction between a judge and a jury as the trier of fact.* (emphasis supplied).

The Court, 298 Md. at 547, 471 A.2d 701, explained its rationale:

[W]e have not deterred the practice of the same judge presiding at separate court trials of the same defendant when severance has been granted or at retrial after a mistrial or reversal on appeal.

We conclude that *in a court trial,* upon joinder of similar offenses *where the evidence would not be mutually admissible* at separate trials, *prejudice is not assumed as a matter of law.*

The question then is whether a given defendant is in fact prejudiced by the joinder. In order for a judgment to survive in the face of a similar offense joinder with evidence not mutually admissible, we think that the record must be sufficient to show that the defendant was not in fact prejudiced by the joinder. This would not be feasible as to a jury trial. (citations omitted) (emphasis supplied).

In the *Graves* case, the trial judge had ordered a joinder notwithstanding the fact that it was "undisputed that the evidence as to each individual indictment would not be mutually admissible at separate trials." 298 Md. at 548, 471 A.2d 701. Both this Court and the Court of Appeals affirmed. The Court of Appeals held, 298 Md. at 549–550, 471 A.2d 701:

... Md.Rule 745 [now Md.Rule 4–253] applies to both trial with a jury and trial by the court. However, *in a court trial the joinder for trial of similar but unrelated offenses where the evidence as to each individual offense is not mutually admissible at separate trials does not prejudice the defendant as a matter of law.* On the facts and circumstances of this case, the record is sufficient to establish that Graves was not prejudiced by the joinder of the indictments for trial. Thus there was no error and therefore no abuse

of the court's discretion in granting the motion for joinder. (emphasis supplied).

*But see McKinney v. State,* 82 Md.App. 111, 126–128, 570 A.2d 360 (1990), the rationale of which appears to be in flat-out conflict with that of *Graves.*

One epidemic problem broadly bedevils our severance/joinder law. Much of our case law seems to have strayed into analytic quicksand by pursuing too closely a flawed analogy to the "other crimes" admissibility principles of *State v. Faulkner,* 314 Md. 630, 552 A.2d 896 (1989) on which it heavily relies. *State v. Faulkner* is the definitive treatment of "other crimes" evidence and sets out the three necessary steps that must be taken before, in the trial of a single case, evidence of "other crimes" will be admitted. *See also Ross v. State,* 276 Md. 664, 350 A.2d 680 (1976); *Cross v. State,* 282 Md. 468, 386 A.2d 757 (1978); *Harris v. State,* 324 Md. 490, 597 A.2d 956 (1991). The three *Faulkner* steps, however, are not properly applicable to a severance/joinder determination. "Other crimes" law and severance/joinder law share, to be sure, some overlapping concerns, but they are by no means precise parallels.

In severance/joinder cases, the mutual admissibility requirement guards against potentially contaminating evidence other than mere evidence of "other crimes" and is, therefore, far broader in its exclusionary coverage. The mutual admissibility that is necessary for trial joinder, moreover, is contingent upon relevance generally and does not start, as the first step of conditioning "other crimes" evidence does, with a presumption of inadmissibility subject only to limited exemptions for evidence showing motive, intent, absence of mistake, identity, or common scheme. *Harris v. State,* 324 Md. 490, 597 A.2d 956 (1991). Evidence showing consciousness of guilt, for instance, as *State v. Edison,* 318 Md. 541, 569 A.2d 657 (1990) acknowledges, is admissible in a severance/joinder situation, although it is not routinely listed as an exception to the "other crimes" rule. As long as the evidence bearing directly on one charge also has some relevance in proving the other charge, the evidence is, by definition, mutually admissible. Save only

for the final balancing requirement, nothing more is required for purposes of trial joinder. For a joint *court* trial, moreover, even mutual admissibility is not strictly required. The analogy does not hold.

The second step in testing "other crimes" evidence, according to *Faulkner,* is for the State to convince the trial judge by the clear and convincing standard of persuasion that the other crimes, indeed, occurred. The mutual admissibility test for joint jury trials does not include any such threshold requirement. Indeed, it would virtually require the State to prove each of its two sets of charges to the judge outside the presence of the jury before proceeding to the joint trial before the jury. *A fortiori,* there is no such step required for a joint *nonjury* trial, where mutual admissibility is not even an absolute requirement. *Graves v. State,* 298 Md. 542, 546–550, 471 A.2d 701 (1984). Nor does severance/joinder law have any enhanced standard of persuasion as a precondition to evidentiary admissibility. Once again, the analogy does not hold.

The only aspect that "other crimes" law and severance/joinder law have in common is the balancing of probative value against unfair prejudice. Even here, however, the balancing is not the same. Judicial economy and the avoidance of the inconvenience of largely duplicative trials are very weighty, albeit not dispositive, factors in joint trial determinations. *Lewis v. State,* 235 Md. 588, 590, 202 A.2d 370 (1964); *Cook v. State,* 84 Md.App. 122, 130, 578 A.2d 283 (1990), *cert. denied,* 321 Md. 502, 583 A.2d 276 (1991); *Erman v. State,* 49 Md.App. 605, 611, 434 A.2d 1030 (1981); *Stevenson v. State,* 43 Md.App. 120, 130, 403 A.2d 812 (1979), *aff'd,* 287 Md. 504, 413 A.2d 1340 (1980). *See also Zafiro v. United States,* 506 U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). They are factors that have absolutely nothing to do with the admissibility of "other crimes" evidence. There is no downside to keeping out evidence of "other crimes" for the other crimes are not the subjects of pending trials. Judicial economy is, indeed, the only reason for permitting joint *nonjury* trials *where the evidence is not mutually admissible.*

When a severance is granted, an additional trial becomes necessary and witnesses may well be called back to the courthouse for a repeat performance. When in the context of a single trial, on the other hand, "other crimes" evidence is excluded, no such costs are incurred. Severance/joinder law and evidence of "other crimes" law deal with distinct trial problems, and the respective analyses should not, because of a minor overlap, be uncritically blended into a single analysis. Again, the analogy is badly flawed if not totally inapt. There is, to be sure, a resemblance between the two bodies of legal doctrine, *but the resemblance is slight.*

The danger, of course, is that the flawed analogy may have been uncritically copied and repeated so many times that it has become an institutional hallmark beyond realistic hope of disestablishment. The effort, however, must be made.

### 3. The Severance Issue in this Case

Whatever the evaporation of discretion that may be taking place on the periphery of the severance/joinder issue, it is clear that at the core, in a jury trial where evidence on the separate charges is not mutually admissible, there is no discretion left. We are, rather, under the rule of law promulgated in *McKnight v. State,* 280 Md. 604, 612, 375 A.2d 551 (1977):

> We think that a defendant charged with similar but unrelated offenses is entitled to a severance where he establishes that the evidence as to each individual offense would not be mutually admissible at separate trials.

In all candor, if the trial judge had had it within his discretionary prerogative to join the two sets of charges in this case in a single jury trial, notwithstanding that the evidence was not mutually admissible, the circumstances are sufficiently marginal and debatable that we would frankly find no abuse of discretion on his part. Had we ourselves been making the severance decision in the first instance, our decision might have well been different than the one made by the trial judge. That, however, would prove nothing. Within the

discretionary range, both the decision to join and the decision to sever could both be legitimate options and neither would constitute an abuse of discretion. For a trial judge to exercise discretion differently than an appellate court might think it would is not, *ipso facto,* an abuse of discretion. As we have said, however, this was not a situation where discretion was involved. We do not hold that the trial judge abused his discretion.

We hold, rather, that the trial judge was in error as a matter of law in joining the two sets of charges for trial before a jury for the reason that the evidence was not mutually admissible. Between the trial of the earlier episode at the 7–Eleven and the trial of the later episode at Glebe Road, the evidence was probably inadmissible in both directions. It clearly was inadmissible in one direction—the receipt of the later conduct at Glebe Road at the trial of the earlier incident at the 7–Eleven—and that is all that is required to keep the evidence from being *mutually* admissible.

The firing of the gun at Glebe Road, be it deliberate or reckless or accidental, was not relevant to prove the offenses at the 7–Eleven. Whatever happened at the 7–Eleven was a *fait accompli.* Neither the possession nor the use of the gun at Glebe Road helped to prove the earlier carrying of the gun at the convenience store. That the police later recovered the gun from Glebe Road would, to be sure, be admissible on the charge of carrying the handgun from the 7–Eleven to Glebe Road, but the actual firing of the gun at Glebe Road and the potentially deadly consequences of that firing was clearly excessive detail that was not admissible. *State v. Edison,* 318 Md. 541, 562–565, 569 A.2d 657 (1990).

Nor did the use of the gun at Glebe Road help to prove that the appellant assaulted Mohammed Khawar Ullah by attempting to place him in fear of imminent bodily harm. What it did do, arguably, was to demonstrate that the appellant was an inherently dangerous and violent person and not one who, on the earlier occasion, was guilty perhaps of nothing more than strutting or bluffing. At the 7–Eleven, the appellant did not

brandish the handgun although he did display it, still in his belt. The words he spoke to Khawar were clearly hostile and gave rise to a permitted inference of a threat to harm. They were not so unequivocal, however, that there could not have been some residual doubt as to whether the appellant was actually threatening imminent bodily harm. The later evidence of events at Glebe Road, however, supercharged the trial of the earlier incident with an arguable propensity for deadly violence on the part of the appellant.

That one-directional inadmissibility is enough to preclude the necessary *mutuality* of admissibility was made clear by Chief Judge Wilner in *Kearney v. State*, 86 Md.App. 247, 586 A.2d 746, *cert. denied*, 323 Md. 34, 591 A.2d 250 (1991). In that jury trial, Kearney was shown to have committed a kidnapping on one occasion and a murder three days later of the same victim. While the earlier kidnapping shed light on the subsequent murder, evidence of the subsequent murder would not have been admissible, at a separate trial, to help prove the earlier kidnapping. Judge Wilner held, 86 Md.App. at 253–254, 586 A.2d 746:

> The trial court erred, however, in determining that the "other crimes" evidence of the kidnapping on January 18 and the murder on January 21 was mutually admissible. While evidence of the kidnapping would be admissible at the trial for the murder as tending to establish appellant's intent and knowledge, the reverse is not true. Any evidence of the murder would be wholly irrelevant in a trial for kidnapping to prove any of the exceptions noted in *Ross* [276 Md. 664, 669–670, 350 A.2d 680 (1976)]. Therefore, because evidence of the murder would not be admissible in the trial for the kidnapping, the evidence cannot be *mutually* admissible. Thus, the joinder of the offenses for trial in this case was in error. (emphasis in original).

As *Kearney v. State*, however, pointed out for the very first time, the remedy for a misjoinder need be no broader than the harm. A one-directional inadmissibility only calls for a one-directional reversal and remand. Avoiding a needlessly wasteful blunderbuss sanction, Chief Judge Wilner fashioned

an appropriately tailored remedy, 86 Md.App. at 255, 586 A.2d 746:

> [A] finding of *some* prejudice as a matter of law in a jury trial does not necessitate a finding that everything was thereby prejudiced.
>
> Here, were we to order new trials for *both* offenses, we would end up with one trial for the kidnapping on January 18, at which evidence of the events occurring on the 21st would not be admissible, and another trial for the kidnapping and murder on January 21, at which evidence of the kidnapping on the 18th *would* be admissible. While we must order the first, we have already had the second—the trial below. In light of the fact that any retrial on the murder count would be identical in every relevant way to the trial actually conducted below, we find no error—and hence no prejudice—in the admission of the events of January 18 during appellant's trial for murder. Accordingly, we shall vacate the judgment entered on Count I of Indictment CT892484X—the kidnapping that occurred on January 18—and remand that case for a new trial. We shall, however, affirm appellant's conviction for murder. (emphasis in original).

Under the circumstances, it is mete that we also examine the admissibility of the evidence in this case in the other direction. The evidence from the 7–Eleven was inadmissible at the trial of the Glebe Road offenses. The reason advanced by the State for showing the earlier episode is inconsequential. The reason Bryan Wieland had for going to his brother's residence at an early hour of the morning had little, if any, significance in assessing the appellant's guilt once Bryan arrived. On the other hand, the prejudice to the appellant was clear. For a homeowner, rudely awakened by loud kicking at his door at an early hour of the morning, to arm himself as he approaches his door would be neither illegal nor bizarre. For him to see through a glass panel a person he deemed to be a stranger first walking away from the door and then returning to it would make both apprehension and nervousness plausible. The appellant's position, however, was

seriously compromised by the evidence of his earlier truculent behavior. The State's theory of the case required a leap of logic that was impermissibly speculative. The earlier demonstrated hostility toward Mohammed Khawar Ullah at the 7–Eleven does not support a permitted inference that, later at Glebe Road, the appellant deliberately fired in the act of opening his front door, apparently believing the "midnight caller" to be Mohammed Khawar Ullah himself or perhaps Khawar's brother, Mohammed Amjad Ullah, or perhaps an investigating or apprehending police officer. On the other hand, the evidence of the appellant's earlier churlish behavior may well have tarnished him, in the jury's eyes, as a hostile and aggressive "time bomb" with a ready propensity to use a gun offensively.

We also find the State's last-gasp reliance on *Tichnell v. State*, 287 Md. 695, 415 A.2d 830 (1980), unpersuasive. At first glance, *Tichnell's* words, 287 Md. at 712, 415 A.2d 830, would seem to offer the State some solace:

> One such exception permits the admission of evidence of other crimes when the several offenses are so connected or blended in point of time or circumstances that they form one transaction, and cannot be fully shown or explained without proving the others.

Particularly consoling would seem to be its later observation, 287 Md. at 713, 415 A.2d 830:

> As we have indicated, the offenses consolidated for trial were closely related to each other and occurred within a fifteen-minute period within a tightly confined area near Davidson's store. Among other reasons, the proximity of time and space within which the offenses were committed distinguishes this case from *Jones*.

On closer analysis, even the words of *Tichnell* afford the State little comfort. Its reference to the close proximities of time and place are merely offered "among other reasons" to distinguish its circumstances, where severance was not required, from those in *State v. Jones*, 284 Md. 232, 395 A.2d 1182 (1979), where severance was required. It is the factual

context of *Tichnell,* however, that sets it far apart from the State's situation in the present case. The flagship charge against Tichnell was that of the murder in the first degree of a deputy sheriff. The other offenses, the trials of which Tichnell wanted severed from the murder trial, were 1) a breaking and entering and theft a few minutes before the murder, which the deputy sheriff was responding to when Tichnell shot him, and 2) the armed robbery of the deputy sheriff and the stealing of his police cruiser at the time of the murder. As Chief Judge Murphy pointed out in the *Tichnell* opinion, the breaking and entering, the killing of the deputy sheriff who attempted to arrest him for the breaking and entering, and the simultaneous taking of the deputy's police cruiser by Tichnell "constituted one continuous and uninterrupted criminal transaction." 287 Md. at 710, 415 A.2d 830. One of the theories of first-degree murder, moreover, was felony-murder and either the earlier breaking and entering or the subsequent robbery could have served as the predicate felony for felony-murder. Chief Judge Murphy stated, 287 Md. at 710, 415 A.2d 830:

> In ordering the consolidation under Rule 745a, Judge Pollitt agreed with the State's position, noting in addition that to *prove the commission of a felony murder, the prosecution would have to establish the underlying felony of either storehouse breaking or robbery,* both crimes being charged in the other indictments joined for trial. (emphasis supplied).

That was the situation facing the Court in *Tichnell* when it spoke of several offenses being "so connected or blended in point of time or circumstances that they form one transaction, and cannot be fully shown or explained without proving the others." 287 Md. at 712, 415 A.2d 830. In looking at the five Maryland cases cited as authority for that statement, moreover, four of the five simply use that language in the course of a general discussion not pivotal to the decisions in those cases. The one precedential authority where the outcome hinged on the close relationship of the offenses was *Wood v. State,* 191 Md. 658, 62 A.2d 576 (1948). Wood was on trial for first-

degree murder of a policeman who was attempting to apprehend him for the armed robbery and kidnapping of a taxicab driver half-an-hour earlier. Wood argued that the taxicab episode was a *fait accompli* and that evidence of it should not have been admitted in the murder trial. Holding that the robbery may still have been in progress and, therefore, could serve as the predicate felony for felony-murder, Judge Henderson stated for the Court of Appeals, 191 Md. at 668, 62 A.2d 576:

> [W]e cannot rule as a matter of law that the robbery was completed, when in fact the hue and cry was promptly raised and the accused was intercepted, within half an hour after the robbery, with the loot and the weapon used in the robbery in his possession.

*See also State v. Jones,* 284 Md. 232, 395 A.2d 1182 (1979).

There was no such connection between the 7–Eleven offenses and the Glebe Road offenses in this case. We hold that the failure to sever the trial of the two sets of offenses was reversible error.

### Sufficiency of the Evidence

Our reversal of the convictions because of the erroneous misjoinder would ordinarily be dispositive of this appeal. The appellant has, however, raised the contention that the evidence was not legally sufficient to support the convictions for the four offenses he was found to have committed at Glebe Road. The appellant has not raised any challenge to the evidentiary sufficiency of the three convictions at the 7–Eleven. Indeed, in good conscience, he could not do so.

### 1. Why Should We Also Review Legal Sufficiency?

Because we are reversing on other grounds, the appellant's contention with respect to the legal insufficiency of the evidence is, for dispositive purposes of this appeal, mooted. It is, nonetheless, highly appropriate that we address the issue because of the *possible* double jeopardy implications of such a ruling. If we hold that the evidence was legally sufficient to

support a conviction, there could be no viable future claim that the double jeopardy protection bars a retrial following appellate reversal. If, on the other hand, we hold that the evidence was not legally sufficient to support a conviction, there is always the *possibility* that a legitimate double jeopardy problem may arise.

We hasten to add that we do not *sua sponte* raise an anticipatory double jeopardy claim on behalf of an appellant or presume to tell either the State's Attorney or the trial judge what they may or may not do by way of a retrial. . Even if we were so disposed, we are not empowered to do so. Double jeopardy is not an issue before us. It is, moreover, an issue that has not yet arisen anywhere and may, indeed, never arise. If the State's Attorney chooses to retry a defendant, notwithstanding our holding of legal insufficiency, and the defendant, through choice or neglect, should raise no double jeopardy claim, there would be no bar to a retrial going forward. In the more likely scenario, however, that the defendant should raise a double jeopardy claim, then our holding as to evidentiary insufficiency would serve at that time in that forum as the predicate for a ruling that a retrial would be barred. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). It is, thus, appropriate that we address the issue.

## 2. *Collateral Estoppel or Judge–Jury Inconsistency or Neither*

■ In this case, it is unnecessary to consider the tantalizing question of whether in a jury trial a judge's ruling of legal insufficiency as to one count will have any necessary spill-over or collateral estoppel-like effect on other counts or whether a logical inconsistency between a jury's verdict on one count and a judge's ruling on another count would be fatal. Under the circumstances of this case, either of those arguments that might be made collapses with the collapse of its factual predicate.

The appellant's primary argument in terms of legal insufficiency is a common denominator argument that goes to all of

the Glebe Road offenses. He concludes, largely with mirrors and sleight of hand, that the trial judge somehow made a legal ruling that the evidence in the case was not legally sufficient to support any finding that the firing of the handgun at Glebe Road was other than accidental. It is a jerry-built conclusion that will not withstand close scrutiny. In addition to the crimes for which he was convicted, the appellant was also tried for assault with intent to murder his brother at Glebe Road. When, at the end of the State's case, the appellant moved for a judgment of acquittal, the judge offered the observations that the appellant now relies on:

> The Court agrees that there is no inference that the defendant would shoot anyone arising from the incident which occurred at the 7-Eleven Store.... Certainly it was an accident for the defendant to have shot his brother. Probably not even the State contests that.

That was no more than an interested, and interesting, observation on the part of the trial judge. It is both legally and logically bereft of any significance. It is not a finding of fact, for the judge was not elected by the appellant to be the fact finder in this case. Neither is it a legal ruling with respect to legal insufficiency. The legal ruling, indeed, went in the opposite direction. Following the quoted observations, the judge went on to add:

> But it was not necessarily an accident for the defendant to have shot whatever human being was standing on the front steps, and of course that's where the State's transferral of intent arises.

Of even more significance, the judge then denied the motion for a judgment of acquittal. The literal ruling, therefore, was that the evidence was legally sufficient. There clearly was no ruling of legal insufficiency at that point to which those words could even lend interpretive color.

Just as the judge's observations do not lend legal support to the appellant's argument, neither do they lend logical support. In the context of this case, the only "accident" that the judge was referring to was the appellant's mistaken identification of his shooting victim. It accidentally turned out to be the

appellant's brother rather than some hostile stranger. That is indisputably the import of the judge's observation that "it was an accident for the defendant to have shot his brother." Accidentally shooting the wrong person does not necessarily equate with accidentally pulling the trigger.

Later in the trial, to be sure, the judge did grant, at the end of the entire case, the appellant's motion for a judgment of acquittal with respect to the charge of assault with intent to murder at Glebe Road. The judge gave no reason for granting the motion at that time, however, and there is no ruling as to legal insufficiency that necessarily is implicit within it. The judge might have concluded that the evidence was not legally sufficient to support a finding that the firing of the gun was other than accidental. If that were the case, however, it is strange that he allowed the assault and battery charges at Glebe Road to go to the jury. It may, on the other hand, have been the case that the judge did not believe the evidence was legally sufficient to find that the appellant was sober enough to have formed any specific intent. It may alternatively have been the case that the judge, even though believing the firing of the gun to have been arguably deliberate, did not believe that the evidence was legally sufficient to find that the appellant intended to murder his victim, whoever the victim might be, rather than merely to scare the victim or even to wound the victim. It may also have been that the judge harbored the belief that the appellant could not have had a specific intent to murder Bryan Wieland unless he knew that the person at whom he was shooting was, indeed, Bryan Wieland. In short, we cannot distill from the ruling on the motion for a judgment of acquittal any necessary ruling with respect to evidentiary insufficiency.

In all other regards, the Glebe Road convictions suffered no problem in terms of the legal sufficiency of the evidence to support them.

### 3. Battery

Taking that version of the evidence most favorable to the State, the jury could reasonably have found that the

appellant subjected Bryan Wieland to an offensive touching by shooting a bullet into his shoulder. It is not necessary to a finding of battery that the defendant correctly identify his battery victim. Victim X will suffice. The jury could also reasonably have found that the appellant possessed the general intent to commit a battery on the person, known or unknown, standing outside his front door. In that case, it would have been an intentional battery. *Snowden v. State,* 321 Md. 612, 617, 583 A.2d 1056 (1991).

By the same token, the jury could just as reasonably have found the appellant guilty of battery on the theory that his reckless or grossly negligent conduct, in brandishing a cocked and loaded firearm while in a less than sober condition, caused the harm to be inflicted on the battery victim, whether the appellant intended to cause that harm or not. In that case, it would have been an unintentional battery. *Duckworth v. State,* 323 Md. 532, 540–544, 594 A.2d 109 (1991); *Lamb v. State,* 93 Md.App. 422, 454–455, 613 A.2d 402 (1992), *cert. denied,* 329 Md. 110, 617 A.2d 1055 (1993).

### 4. Assault

The legal sufficiency of the evidence to support a conviction for intentional battery represents *ipso facto* legally sufficient evidence to support the lesser included and antecedent assault of the attempted battery variety. *Ott v. State,* 11 Md.App. 259, 265, 273 A.2d 630, *cert. denied,* 262 Md. 748 (1971); *Weddle v. State,* 4 Md.App. 85, 90, 241 A.2d 414 (1968). Since an intended battery is a general intent crime, the antecedent attempt to commit such a battery—one of the forms of assault—is also a general intent crime. The evidence was such that the jury could reasonably have concluded that the appellant intended to shoot the person standing in front of his door, whoever that person may have been, and that the appellant took a substantial step beyond mere preparation in furtherance of that general intent. That would support a conviction for assault.

### 5. Reckless Endangerment

■ The evidence was also legally sufficient to support a verdict of guilty of reckless endangerment. For pleading purposes, we now know that the person recklessly endangered was Bryan Wieland. For purposes of committing the crime, however, it was not necessary that the appellant knew the identity of the person he was endangering. It is enough that he knew he was placing *some* person at risk. In terms of *corpus delicti,* deliberately firing a bullet into the torso of another person could be deemed to create "a substantial risk of death or serious physical injury to another person." At a lesser, but still sufficient, level of risk, even brandishing a loaded and cocked weapon in the direction of another person, particularly when in shaky control of one's motor skills, could also be deemed conduct that "creates a substantial risk of death or serious physical injury to another person." At the *mens rea* level, the evidence was sufficient to permit the jury to find that the appellant was aware that his firing, or his brandishing, of the weapon created *some* risk of harm and that he then consciously disregarded such risk. That would support a conviction for reckless endangerment. *Minor v. State,* 326 Md. 436, 605 A.2d 138 (1992); *Williams v. State,* 100 Md.App. 468, 641 A.2d 990 (1994).

### 6. Carrying a Handgun

Because a consideration of the sufficiency of the evidence to support the appellant's conviction for a violation of § 36B is so intertwined with the legal argument, involving the interpretation of a statute, raised by the appellant in his third contention, we turn our attention to that specific contention.

#### Carrying a Handgun: The Residential Exemption

■ It is the appellant's position that § 36B does not cover the circumstances proved against him in this case, to wit, that he carried a handgun on the night of the offense in his home on Glebe Road. Arguing that the State's proof did not negate the exception created by § 36B(c)(4), he argues thereby that the evidence was not legally sufficient to support the convic-

tion.  If he is correct and if the State should at some future time attempt to retry him on this charge, he would, should he choose to invoke it, have a valid double jeopardy claim.  The evidence is not really in dispute.  It is the meaning of the statute to which that evidence must be applied that requires our scrutiny.

The criminal offense itself is defined by § 36B(b), which provides:

> Any person who shall wear, carry, or transport any handgun, whether concealed or open, upon or about his person, and any person who shall wear, carry of knowingly transport any handgun, whether concealed or open, in any vehicle traveling upon the public roads, highways, waterways, or airways or upon roads or parking lots generally used by the public in this State shall be guilty of a misdemeanor.

For present purposes, the pertinent part of that definition is:

> Any person who shall . . . carry . . . any handgun . . . upon or about his person . . . shall be guilty of a misdemeanor.

It is the appellant's position that the statute was not intended to cover and, therefore, does not cover, among other noncoverages, the "wearing, carrying, or transporting" of a handgun by, *inter alia,* a homeowner within the home.  Initially, the appellant's position finds support in § 36B(a), the Legislature's "Declaration of Policy."  Subsection (a)(ii) provides:

> The result has been a substantial increase in the number of persons killed or injured which is traceable, in large part, to *the carrying of handguns on the streets and public ways* by persons inclined to use them in criminal activity.  (emphasis supplied).

That was Holmes's "felt necessity of the times" to which the statute responded.  *State v. Crawford,* 308 Md. 683, 695, 521 A.2d 1193 (1987), confirmed that the legislative purpose in enacting the statute was to curtail the possession of handguns in public:

It is clear that the 1972 handgun control legislation is designed to discourage and punish the possession of handguns on the streets and public ways.

The limitation on the coverage of the statute which is there implicit was made explicit by subsection (c) which created five express exceptions to the otherwise criminal conduct. Concerning us here is the fourth of those exceptions, which provides, in pertinent part:

Nothing in this section shall prevent a person from wearing, carrying, or transporting a handgun within the confines of real estate owned or leased by him or upon which he resides. . . .

The applicability of that exception to the carrying of a handgun by the appellant in his own home seems clear. It does not, as the State suggests, create an "open season" on potential victims unlucky enough to be inside the gunman's home. Should he unlawfully use a gun on his victims even inside his home, the laws against murder, manslaughter, mayhem, assault with intent to murder, assault and battery, etc., still abide. It is simply the limited case that the carrying-of-a-handgun statute does not.

The State attempts to wriggle out from under the exception by pointing out that the appellant was charged not simply with carrying a handgun but, rather, with carrying a handgun "with the intent to injure Bryan Wieland." The State invokes the provisions of subsection (b)(iv), which provides:

If it shall appear from the evidence that any handgun referred to in this subsection was carried, worn, or transported with the deliberate purpose of injuring or killing another person, the court shall impose a sentence of imprisonment of not less than 5 years.

The State argues that the exceptions to the coverage of the statute, spelled out by subsection (c), apply only to the crime in its unadorned form and do not apply when an aggravating adverbial feature, such as "with the deliberate purpose of

injuring," is engrafted onto it. Such a construction of the statute is completely untenable.

It is subsection (b) that defines the crime. After defining it, it then provides not one but four various penalty provisions. They are respectively dependent upon various attendant circumstances. *Frazier v. State,* 318 Md. 597, 601, 569 A.2d 684 (1990). After listing the circumstances under which "Any person ... shall be guilty of a misdemeanor," subsection (b) leads into the penalty provisions by adding "... and on conviction of the misdemeanor shall be fined or imprisoned as follows:" The four alternative sentencing possibilities that follow do not in any way determine who "shall be guilty of a misdemeanor." They only come into play "on conviction of the misdemeanor." Equally clearly, they do not in any way affect the coverage of the exceptions to § 36B(b). What the State invokes is a sentence enhancing provision, pure and simple. The exception from the coverage of the statute provided by subsection (c)(4) is undisturbed.

Nothing having been presented by the State which would take the appellant's conduct out from under the exception, we hold that the State's evidence was not legally sufficient to support his conviction for a violation of § 36B.

### The Mandatory Sentencing Provision of § 36B(b)(iv)

The appellant's fourth contention is that the mandatory five-year sentencing provision of § 36B(b)(iv) is ambiguous and that the so-called "Rule of Lenity" should resolve any ambiguity in the appellant's favor. Our reversal of the appellant's conviction for the violation of § 36B renders the contention moot.

### Error, Plain and Arcane

There is another matter raised by the appellant which has not been preserved for appellate review. We are not, therefore, required to address it. In this case, however, we would like to address it—*if we can.*

■ There was significant evidence in this case that the appellant was very intoxicated, arguably intoxicated enough to have been incapable of forming various specific intents. Voluntary intoxication, although it will never be allowed to negate a general criminal intent, may, if sufficient, be found to have eroded a specific intent. On the charge of carrying a handgun with the intent to injure another person, the appellant requested and received a jury instruction on the possibly erosive effect of his voluntary intoxication on the specific-intent-to-injure element of the offense. The appellant requested nothing more with respect to an instruction on the effect of intoxication on specific intent. At the conclusion of the trial judge's instructions, the appellant indicated no displeasure at the judge's instruction on this subject.

He raises on appeal, for the first time, the claim that two other charges that went to the jury were specific intent crimes. He now argues that it was error for the trial judge not to have instructed the jury on the possibly erosive effect of voluntary intoxication on those two additional specific intents. The crimes in question are 1) the assault on Mohammed Khawar Ullah at the 7–Eleven and 2) the assault on Bryan Wieland at Glebe Road. The first of those assaults was of the intent-to-frighten variety. The second was of the attempted-battery variety.

The appellant asks us to overlook nonpreservation by exercising our discretion to notice "plain error." Md.Rule 4–325(e). As we indicated in *Austin v. State,* 90 Md.App. 254, 600 A.2d 1142 (1992), we are extremely loath to overlook the procedural dereliction of counsel, who has just as much, if not more, responsibility to be fully briefed on every legal subtlety of the case as does the trial judge. In this instance, however, there is present the factor that is sometimes more likely to persuade us to notice "plain error," when we can, then any other—"the opportunity ... to illuminate some murky recess of the law." *Austin v. State,* 90 Md.App. 254, 271, 600 A.2d 1142 (1992).

We would like to explore the subtle question of whether an assault of the intent-to-frighten variety or an assault of the attempted-battery variety or both involve any specific intent. An exemption from nonpreservation for "plain error," however, does not seem to present us that opportunity, unless the word "plain" has lost all meaning.

An assault of the intent-to-frighten variety, we might conclude, involves a specific intent. The failure to give the instruction in issue might, therefore, have technically been error. By no stretch of the imagination, however, could such an error, if it be error, be deemed "plain." It is an issue that has never been the subject of an appellate decision in Maryland. At most, it has been alluded to once in passing *dicta. Lamb v. State*, 93 Md.App. 422, 445, 613 A.2d 402 (1992), *cert. denied*, 329 Md. 110, 617 A.2d 1055 (1993). It is an issue of first impression. It involves, moreover, a very subtle nuance of *mens rea* analysis which is on the very cutting edge of legal thought. If error it was, it certainly was not *plain*. The *qualifying* adjective "plain" in the phrase "plain error" is not without meaning or content. *Austin v. State*, 90 Md.App. 254, 268–269, 600 A.2d 1142 (1992); *Williams v. State*, 34 Md.App. 206, 211, 366 A.2d 399 (1976) ("It is the extraordinary error and not the routine error that will cause us to exercise the extraordinary prerogative.") The notion of plain error simply does not embrace arcane error. Our analysis, via this avenue, is thwarted.

An assault of the attempted-battery variety, we might also conclude, involves *no* specific intent at all. If the notion of plain error does not embrace *arcane error*, *a fortiori* it would not embrace *arcane non-error*. Our analysis, via this avenue, is doubly thwarted.

### Alternative Review Under Maryland Rule 8–131(a)

In this case, however, we can avail ourselves of the provisions of Maryland Rule 8–131(a). It provides:

(a) **Generally.**—The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule

2–322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. *Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.* (emphasis supplied).

The clear meaning of those words (so clear that no interpretive gloss is necessary) is that no nonpreserved appellate issue, other than jurisdiction, may serve as the reason for an appellate reversal. The extraordinary but limited exception to the foreclosure of appellate review is then expressly and narrowly defined within the very sentence that creates it. The limited exception to what is "ordinarily" review foreclosure "kicks in" when the case is going to be remanded in any event, necessarily on the basis of some other issue that was preserved. *"But* the Court *may* ... *if."* In such a case, the reviewing court may take notice of even a nonpreserved issue for the qualifying condition (the "may ... if" exception to the foreclosure) is satisfied because it is "necessary or desirable to guide the trial court" or because it may "avoid the expense and delay of another appeal." Those qualifying contingencies could not even come into play unless the case were going to be remanded in any event. When, by contrast, a judgment is necessarily affirmed because otherwise reversible error has not been preserved for appellate review, the exemptions from the foreclosing effect of non-preservation cannot exist. There can be no necessity to guide the trial judge on remand because there can be no remand. For the same reason, there can be no possible expense or delay from another appeal because there can be no retrial from which another appeal might be taken. The very *raison d'etre* for noticing a non-preserved issue—obviously judicial economy—does not exist.

In this case, however, we are reversing because of the misjoinder, an issue that was preserved. Because the issue of whether either variety of assault includes a specific intent and

may, therefore, be the proper subject of a voluntary intoxication instruction may easily arise on a possible retrial, it is necessary and desirable that we address the issue for the guidance of the trial court and, thereby, possibly avoid the expense and delay of another appeal. The condition for overlooking non-preservation is satisfied.

## 1. Specific Intent Versus General Intent

Notwithstanding some disenchantment in academic circles [1] with the specific intent-general intent distinction, Maryland is among the many states that have adopted the distinction. It is a distinction that takes on critical importance most frequently in assessing the effect of voluntary intoxication on a defendant's capacity to entertain a certain *mens rea*.[2] In *Shell v. State*, 307 Md. 46, 512 A.2d 358 (1986), Judge Eldridge conducted a thorough review of both specific intent generally and of the significance of the specific intent-general intent

---

1. *See, e.g.,* Jerome Hall, *General Principles of Criminal Law* 142 (2d ed. 1960). Although the Model Penal Code has deliberately eschewed any use of the terms "specific intent" or "general intent," it has effectively subsumed the mental state that Maryland and the other jurisdictions refer to as "specific intent" within its definition of the culpability requirement of a defendant's acting "purposely." *Model Penal Code and Commentaries* § 2.02(2)(a) (Official Draft and Revised Comments 1985).

   As cases such as *Shell v. State*, 307 Md. 46, 512 A.2d 358 (1986) and *Smith v. State*, 41 Md.App. 277, 398 A.2d 426 (1979), proceed to fine-tune the Maryland law on the subject of specific intent, the aim is to describe the same mental element that the Model Penal Code apparently seeks to describe with its use of the adverb "purposely." In addition to the general intent to do the immediate act, an incremental specific intent refers to a defendant's design or purpose that some more remote consequence will flow from his generally intended immediate act.

2. *See* Jerome Hall, Intoxication and Criminal Responsibility, 57 Harv. L.Rev. 1045, 1061–1066 (1944). In *People v. Hood,* 1 Cal.3d 444, 82 Cal.Rptr. 618, 625, 462 P.2d 370, 377 (1969), Chief Justice Roger Traynor observed for the Supreme Court of California:

   The distinction between specific and general intent crimes evolved as a judicial response to the problem of the intoxicated offender.... [To] achieve a compromise between the conflicting feelings of sympathy and reprobation for the intoxicated offender, later courts both in England and this country drew a distinction between so-called specific intent and general intent crimes.

distinction to the defense of voluntary intoxication. He observed, 307 Md. at 63–65, 512 A.2d 358:

Maryland's view, deeming voluntary intoxication relevant to "specific intent" crimes but not "general intent" crimes, is also the approach taken in most other jurisdictions. Only a few jurisdictions provide that any mental state, including recklessness, can be negated by voluntary intoxication. At the other extreme, just a few states by statute treat voluntary intoxication as irrelevant unless it produces insanity. Other jurisdictions fall somewhere in between these two positions, most employing the specific intent/general intent distinction or some variant.

Courts and scholars have attacked the specific intent/general intent distinction as illogical and imprecise, and it is apparent from a review of some of the leading cases that the distinction developed as a way of classifying precedents holding voluntary intoxication material or not in various contexts. While the distinction may be illogical and somewhat arbitrary, it does serve to reconcile fairness to the accused with the need to protect the public from intoxicated offenders and to deter such persons. Accordingly we shall endeavor to apply the lines drawn by our prior cases. (footnotes and citations omitted).

*Shell v. State,* moreover, approved, 307 Md. at 62–63, 512 A.2d 358, the definition of and description of specific intent that this Court made in *Smith v. State,* 41 Md.App. 277, 305–306, 398 A.2d 426, *cert. denied,* 284 Md. 748 (1979):

A specific intent is not simply the intent to do the immediate act but embraces the requirement that the mind be conscious of a more remote purpose or design which shall eventuate from the doing of the immediate act. Though assault implies only the general intent to strike the blow, assault with intent to murder, rob, rape or maim requires a fully formed and conscious purpose that those further consequences shall flow from the doing of the immediate act. To break and enter requires a mere general intent but to commit burglary requires the additional specific intent of committing a felony after the entry has been made. A

trespassory taking requires a mere general intent but larceny (or robbery) requires the specific *animus furandi* or deliberate purpose of depriving the owner permanently of the stolen goods. This is why even voluntary intoxication may negate a specific intent though it will not negate a mere general intent.

.    .    .    .    .

The larger class "specific intent" includes such other members as 1) assault with intent to murder, 2) assault with intent to rape, 3) assault with intent to rob, 4) assault with intent to maim, 5) burglary, 6) larceny, 7) robbery and 8) the specific-intent-to-inflict-grievous-bodily harm variety of murder. Each of these requires not simply the general intent to do the immediate act with no particular, clear or undifferentiated end in mind, but the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result.

*See also Avey v. State,* 249 Md. 385, 240 A.2d 107 (1968); *State v. Gover,* 267 Md. 602, 298 A.2d 378 (1973). 1 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* § 3.5 at 315 (1986); Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 851–854 (3d ed. 1982). As Chief Justice Traynor reasoned for the Supreme Court of California in *People v. Hood,* 1 Cal.3d 444, 82 Cal.Rptr. 618, 625, 462 P.2d 370, 377 (1969):

When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.

In determining whether a particular crime possesses a necessary specific intent, we cannot approach the subject categorically but must examine each crime on an *ad hoc* basis. We must inquire whether, in addition to the general intent to

do the immediate act, it embraces some additional purpose or design to be accomplished beyond that immediate act.

### 2. Assault of the Intended Frightening Variety

We hold that an assault of the intentional frightening variety is a specific intent crime. 2 Wayne L. Lafave & Austin W. Scott, *Substantive Criminal Law,* § 7.16(b) (1986) defines this variety of assault as the doing of an act that places the victim in apprehension of immediate bodily harm *with the intent to cause such apprehension.* It classically fits the *Shell–Smith* mold of a specific intent crime. In terms of intent, the defendant must possess the general intent to make the threatening gesture (the raising of the fist, the pointing of the gun). The threatening gesture is the immediate act generally intended. In addition, however, there must be the specific intent for that immediate act to bring about a more remote consequence, to wit, the engendering of the apprehension or fear of imminent bodily harm in the mind of the apparent victim. That second mental element is quintessentially a specific intent.

As we observed in *Lamb v. State,* 93 Md.App. 422, 445, 613 A.2d 402 (1992), *cert. denied,* 329 Md. 110, 617 A.2d 1055 (1993):

> An assault of the intentional frightening variety, on the other hand, requires a *specific intent to place the victim in reasonable apprehension* of an imminent battery. (emphasis supplied).

### 3. Assault of the Attempted Battery Variety

By way of contrast, we assert that an assault of the attempted battery variety does not require any specific intent. The appellant reminds us of our statement, in *Lamb v. State,* 93 Md.App. 422, 443, 613 A.2d 402 (1992), *cert. denied,* 329 Md. 110, 617 A.2d 1055 (1993), that "[b]oth varieties of assault are specific intent crimes." We hereby repudiate that brief *dic-*

*tum* as having been overly broad and overly simplistic.[3]

Because an assault of the attempted battery variety is, by definition, an attempt, it shares all of the characteristics of attempts generally. One such characteristic is that of the required *mens rea*. In this regard, a nettlesome little problem rears its head. In discussions of attempt law generally, it is sometimes, albeit carelessly, said that an attempt is a specific intent crime. There is, to be sure, an intent requirement—one must intend to commit a very particular and precise crime—but such statements fail to distinguish between general intent and specific intent. A particular intent or a precise intent in this sense is not what the law contemplates by the phrase "specific intent." Perhaps a better distinction than that between general intent and specific intent would be a distinction between a direct intent and an indirect intent or a distinction between an immediate consequence and some further purpose to be brought about thereby.

Accurately employed, the term "specific intent" designates some specific mental element or intended purpose above and beyond the mental state required for the mere *actus reus* of the crime itself. Were it not so, every intentional crime would be deemed a specific intent crime and there would no longer even be such a category as that of general intent crimes. Once every intentional crime is denominated a specific intent crime, the problem would be that "specific intent" law would bring with it all of its attendant baggage about the possibly erosive effect of even voluntary intoxication on such intent.

Such baggage is not appropriate with the common law misdemeanor of assault of the attempted battery variety. It is a general intent crime. When, for instance, an assailant shoots a gun or strikes out with his fist, he may 1) intend to hit the victim and 2) also intend thereby to bring about the murder, the rape, or the robbery of the victim. Clearly, those latter, incremental, and more remote intended purposes are

---

**3.** "Repudiate," perhaps, is too harsh a term. Let us say, rather, that we are "fine-tuning" the *dictum* as we distinguish one variety of assault from the other.

specific intents. The more immediate intent of hitting the victim, however, remains a general intent merely to do the *actus reus* of the crime—to wit, to commit a battery.

It is a mistake to speak of attempts generally as having a single monolithic intent element. Some attempts, to be sure, require a specific intent. Other attempts, however, require only a general intent. An attempt to commit a specific intent crime requires the same ultimate specific intent as would the consummated crime. An attempt to commit a *general* intent crime, on the other hand, requires nothing more than that general intent.

A consummated intentional battery requires a general intent on the part of the perpetrator to hit the victim. An attempted battery (assault) requires the same general intent to hit the victim and, therefore, to perpetrate the battery. It is an immediate result that is generally intended and not some more remote end or purpose that might flow from that immediate act.

In *McBurney v. State*, 280 Md. 21, 29, 371 A.2d 129 (1977), Judge Orth pointed out:

A general *mens rea* or intent "includes those consequences which (a) represent the very purpose for which an act is done (regardless of likelihood of occurrence), or (b) are known to be substantially certain to result (regardless of desire)." In some crimes, however, a specific intent is an essential ingredient. "A specific intent, when an element of the *mens rea* of a particular offense, is some intent other than to do the *actus reus* thereof which is specifically required for guilt."

The intent element of an attempted battery involves nothing more than the intent to do the *actus reus* itself. That, by definition, is a general intent.

In *People v. Hood*, 1 Cal.3d 444, 82 Cal.Rptr. 618, 462 P.2d 370 (1969), the Supreme Court of California held that simple assault, just because it involves intent to commit a battery, does not thereby become a specific intent crime. Chief Justice Traynor reasoned, 82 Cal.Rptr. at 625, 462 P.2d at 377:

Even if assault requires an intent to commit a battery on the victim, it does not follow that the crime is one in which evidence of intoxication ought to be considered in determining whether the defendant had that intent. It is true that in most cases specific intent has come to mean an intention to do a future act or achieve a particular result, and that assault is appropriately characterized as a specific intent crime under this definition. *An assault, however, is equally well characterized as a general intent crime under the definition of general intent as an intent merely to do a violent act. Therefore, whatever reality the distinction between specific and general intent may have in other contexts, the difference is chimerical in the case of assault with a deadly weapon or simple assault.* Since the definitions of both specific intent and general intent cover the requisite intent to commit a battery, the decision whether or not to give effect to evidence of intoxication must rest on other considerations. (emphasis supplied).

In *Lamb v. State,* to be sure, we did say, 93 Md.App. at 445, 613 A.2d 402, "In terms of specific intent, the attempted battery variety of assault requires that the assailant intend to punch." Without realizing it, we had contradicted ourselves in a single sentence. After referring to the category of specific intent, we then gave as an example what is quintessentially a general intent—the intent on the part of an assailant to punch his victim. It is to create a paradox to speak of a specific intent to do a generally intended act. Assault of the attempted battery variety is nothing more than a general intent crime.

*Transferred Intent: An Erroneous Solution*
*to An Erroneous Problem*

The appellant complains that a jury instruction on the subject of transferred intent, to which timely objection was made, was erroneous. In an academic sense, indeed, it was, and on possible retrial it should not be repeated. Far from generating prejudice, however, it had the welcome and salubrious effect of forestalling a reverse prejudice. We explain. The flawed instruction had the net therapeutic impact of

erroneously facilitating the State's carrying of a burden that had been erroneously cast upon the State in the first instance. Two errors cancelled each other out.

The evidence was sufficient to support a finding that the appellant, at Glebe Road, in one simultaneous action opened his front door and deliberately fired away. For purposes of further discussion *of this issue,* we will take that as a given. The appellant, thereby, would have been guilty, but for the homeowner exception, of carrying a gun with the intent to injure his victim. The appellant, thereby, was guilty of both a battery and an assault on his victim.

But who was that *intended* victim? The intended victim was the person the appellant was shooting at, not the person he thought he was shooting at. The intended victim, therefore, was Bryan Wieland. That the appellant mistakenly thought his intended victim was someone other than Bryan Wieland was of no consequence either in terms of proof or in terms of pleading. *See, e.g., State v. Wilson,* 313 Md. 600, 607 n. 4, 546 A.2d 1041 (1988) ("Maryland's statute setting forth ... the crime of assault with intent to murder ..., while requiring a specific intent to kill, includes no language requiring an intent to kill a specific victim.") The appellant intended to shoot the person standing outside his front door; his aim was sure; and he shot the person standing outside his front door. His perception of the identity of the person he was shooting at was a non-issue. Transferred intent has nothing to do with it. *See State v. Wilson,* 313 Md. 600, 606 n. 3, 546 A.2d 1041 (1988) ("An assault with intent to murder may be committed, though the person actually assaulted is not the intended victim.")

Everyone got sidetracked, somehow, over the non-issue of whether the appellant "intended" to shoot Bryan Wieland or whether he "intended" to shoot some "other person unknown." No one paused to define his terms when talking about the subject of "intending to shoot" someone. Intending to shoot Bryan Wieland, we conclude, requires nothing more than intending to shoot some member of the species *homo sapiens*

who coincidentally turns out to be Bryan Wieland. The intent to shoot Bryan Wieland does not imply any knowledge or even suspicion that the intended target, Bryan Wieland, is, indeed, Bryan Wieland. If one shoots at the President, erroneously believing him to be a cleverly disguised foreign spy, one intends to shoot the President.

All parties, however, got caught up in the notion that, to convict, the State would somehow have to transfer the malicious intent harbored by the appellant toward some person unknown onto Bryan Wieland, whom the appellant, to his surprise and horror, ended up shooting, not by missing his target but by misidentifying his target. This, erroneously, imposed a burden on the State's case that should never have been cast upon it.

Compounding the problem, the State then sought and received the following jury instruction on transferred intent:

> The next instruction . . . is on the Doctrine of Transferred Intent. The charge of carrying a handgun with the intent to injure requires the specific intent to injure. Specific intent can be inferred through a doctrine called Transferred Intent. Transferred intent applies when the defendant intentionally directs force against a person or persons wrongfully, but instead hits another. If the defendant carried a handgun with the specific intent to injure some person or persons, but not the actual victim, then that specific intent to injure is transferred to the actual victim. It is not a defense to the charge of carrying a handgun with the intent to injure if the defendant did not intend to injure the actual victim, but did intend to injure someone. The Doctrine of Transferred Intent applies to the charge of carrying a handgun with the intent to injure, and also applies to the charge of battery as to Bryan Wieland, and the charge of assault as to Bryan Wieland.

The appellant targets as the error in the instructions the failure to heed the teaching of *Ford v. State*, 330 Md. 682, 625 A.2d 984 (1993) that transferred intent, even in situations where it might otherwise be applicable, only applies to crimes

where the physical harm is actually inflicted, such as murder, mayhem, or battery. As Judge Chasanow explained, 330 Md. at 713, 625 A.2d 984:

> Transferred intent is . . . inapplicable to . . . crimes that can be completed without the necessity of physical contact. Such crimes have one thing in common—where the "bullet" ends up is superfluous to the crime . . . The requisite intent has already been formed and the requisite [offense] has already been committed; no intent need be transferred to complete a crime.

To the extent to which, therefore, the instruction told the jury that whatever ill-will, malice, or intent the appellant may have harbored toward Mohammed Khawar Ullah or some other person unknown could be transferred to the actual victim, Bryan Wieland, the instruction was literally incorrect.

■■ There was, however, no prejudice. The instruction only facilitated the transfer of intent in a situation where no transfer of intent was necessary. Indeed, it was a situation where the entire notion of a transfer of intent was totally inappropriate and immaterial. Wanting, desiring, or hoping to hit Mohammed Khawar Ullah, for instance, is not the same as intending to hit Mohammed Khawar Ullah. If the appellant fired at Bryan Wieland, believing him to be Mohammed Khawar Ullah, the appellant intended to hit Bryan Wieland, not Mohammed Khawar Ullah. One's intent is to hit one's target. It is not one's intent to hit some other person whom the assailant believes the target to be.

The case of *Miles v. State,* 88 Md.App. 248, 594 A.2d 634, *cert. denied,* 325 Md. 95, 599 A.2d 447 (1991), on which the appellant relies, lends no support to his position. It was neither a "bad aim" case nor a "mistaken identity" case. It was rather a bizarre situation where the general intent and the specific intent diverged. The appellant there, in the course of a housebreaking and a rape, committed crimes of violence against both a mother and her seven-year-old son. The holding in question was that Miles could not have been

guilty of an assault with intent to rob on the seven-year-old son because the son had no property and Miles knew it:

[T]here was no evidence presented that the son owned, had any special interest in, or authority over any of the stolen property. Since the appellants could not have intended to rob the son, it follows that they could not have assaulted him with an intent to rob him.

88 Md.App. at 260, 594 A.2d 634.

The Court then held that the specific intent to rob the mother could not be combined with the general intent to assault the son to yield the case of assault with intent to rob on the son. Miles had been charged with assault with intent to rob upon the son, and the proof was that an actual assault was perpetrated on the son. The *Miles* decision stands for nothing more than this and has nothing to do with the situation before us in the present case.

The first time that the general common law doctrine of transferred intent was recognized in Maryland was by this Court in *Gladden v. State,* 20 Md.App. 492, 316 A.2d 319 (1974). The Court of Appeals affirmed in *Gladden v. State,* 273 Md. 383, 330 A.2d 176 (1974). As the academic authorities universally hold and as both *Gladden* opinions confirm, the common law doctrine of transferred intent applies only to "bad aim" cases and not to cases of "mistaken identity." If a defendant shoots at A, misses, and hits B, that will be an occasion for invoking the transferred intent doctrine. If, on the other hand, a defendant shoots at A and hits A, although mistakenly believing that A is B, transferred intent has nothing to do with the case. The defendant hit the very body he intended to hit and the intent, therefore, needs no transferring.

Wayne R. LaFave & Austin W. Scott, *Criminal Law* § 3.12(d) at 285 (Hornbook Series, 2d ed. 1986), discussed the inapplicability of the doctrine of transferred intent to the mistaken-identity cases:

The situation, discussed above, concerning the unintended victim of an intentional crime—which we have referred to

for short as the bad-aim situation—is to be distinguished from an entirely different unintended-victim case—the mistaken-identity situation—which is governed by a quite separate set of legal rules. Thus in the semi-darkness A shoots, with intent to kill, at a vague form he supposes to be his enemy B but who is actually another person C; his well-aimed bullet kills C. Here too A is guilty of murdering C, to the same extent he would have been guilty of murdering B had he made no mistake. A intended to kill the person at whom he aimed, so there is even less difficulty in holding him guilty than in the bad-aim situation. (footnote omitted).

Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 926 (3d ed. 1982), makes the same distinction:

In case of an attack made upon the wrong person as a result of mistaken identity, needless to say, the law will recognize that the assailant "meant to murder the man at whom he shot" although he had in mind the name of another man who was not there. (footnotes omitted).

The appellant intended to harm the person who was standing in front of his door. The appellant then harmed that very person. There was no necessity for any transferring of intent. The erroneous instruction facilitating a needless transfer was not ultimately harmful. In terms of identifying the target of the appellant's criminal intent, the jury's concern had initially been permitted to stray from its proper focus. By a circuitous and fortuitous route, the question of harmful intent was ultimately refocused on the proper human target from whom it should never have wandered in the first place. Notwithstanding the instruction's harmlessness in this case, however, it should not be repeated.

***JUDGMENTS REVERSED; COSTS TO BE PAID BY TALBOT COUNTY.***