# PATRICK D. MILLS *v.* STATE OF MARYLAND

[No. 45, September Term, 1971.]

*Decided October 20, 1971.*

The cause was argued before MURPHY, C. J., and ANDERSON and CARTER, JJ.

*Louis Peregoff* and *William S. Cooper*, with whom was *A. Samuel Peregoff* on the brief, for appellant.

*Gary Melick, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, Howard L. Cardin, State's Attorney for Baltimore City*, and *Stephen L. Miles, Assistant State's Attorney for Baltimore City*, on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

On February 16, 1970, appellant, then sixteen years of age, took his father's .22 caliber automatic pistol to a dance. While at the dance, he and four other boys—Gerald Hunter, Edward Overton, Clark Walker, and Gordon Reid—went into a small second floor bathroom to share a bottle of liquor. As the bottle was being passed between the boys, appellant removed the gun from his pocket and while in the process of loading or unloading the weapon, it either slipped from his hand or was slapped out of it by Gerald Hunter when appellant pointed the weapon in Hunter's direction. The gun struck the floor and discharged; the bullet, following a steep upward path, struck and killed Gordon Reid.

Appellant was subsequently convicted in a non-jury trial of involuntary manslaughter and sentenced to four years imprisonment. He contends on appeal that the evidence was insufficient to support his conviction. He maintains that his conduct was not the proximate cause of

the victim's death and that he was not criminally culpable for his actions.

According to Gerald Hunter, after the five boys assembled in the bathroom to drink from the bottle, appellant "all at once started to play with a gun while we were passing the bottle around. He started messing with it by taking it apart and putting it back together again. After he took it apart the first time, he put bullets into the clip. Then the bottle was passed around to Gordon and then Dutch then back to me, as I had the bottle to my mouth, Pat [appellant] had dropped the gun and it went off."

According to Edward Overton, appellant "was sitting on the sink [in the bathroom] and he was putting bullets into the gun. He was having trouble getting them in so he asked Gerald [Hunter] to pull back the top part of the gun so he could put a bullet in it. After he did this he pointed the gun toward the wall where Gerald was standing. Clark Walker was just handing me the bottle to have a drink when I noticed that the gun was falling toward the floor. When it hit the floor the gun went off * * *."

In a written statement given to the police after his arrest, appellant said that he had taken the gun to the dance to sell it; that when he went to the bathroom with the other boys to drink from the bottle, he took the gun from his pocket because the lining was torn and the gun was hanging out; that he intended to put the gun in another pocket when he noticed that "The clip part was hanging down and that the slide part was back so I took the clip out and noticed that a bullet was stuck up in the sliding part, where the bullets come out. I took my finger and tried to pull the bullet out but it wouldn't come out. I then put the clip back into the gun. I then asked Gerald Hunter to save me some of the bottle. The gun was pointing at Gerald because of the way I was holding it. He told me not to play around with the gun and don't point the gun at me. Gerald·than smacked the gun out of my

hand and the gun hit the floor or the wall * * *" (discharged and killed Reid).

Appellant's testimony at the trial was generally consistent with his statement. He testified that the bathroom was approximately five or eight feet wide; and that when he raised the gun in Hunter's direction, Hunter hollered: "Man, don't wave that gun around my face," after which Hunter "pushed the gun and the gun hit the floor and it went off." Appellant said that Hunter "hit" the middle of his hand and because he (appellant) was not holding the gun "too tight," it fell to the floor. Appellant acknowledged that he didn't know how to unload the gun until, when just prior to arriving at the dance, he was shown how to do it by another boy. He testified that while in the bathroom with the other boys, he took the bullets out of the clip and put the empty clip back into the gun. Appellant admitted knowing that a bullet remained in the chamber of the gun.

In convicting appellant of involuntary manslaughter, the court stated that appellant's possession of the gun was illegal; that he had taken it, loaded, to a party; that although he didn't know how to handle it, he took it out in a small room in the presence of other youths who were drinking; and that he was advised to stop handling the gun by one of the boys who "overtly tried to slap the gun out of his hand or to remove it from the way it was pointed." The court believed the circumstances were such as created a dangerous situation which should have been appreciated by appellant and that he was criminally responsible for causing the death of Gordon Reid.

Involuntary manslaughter at common law has been generally defined as the killing of another unintentionally and without malice (1) in doing some unlawful act not amounting to a felony, or (2) in negligently doing some act lawful in itself, or (3) by the negligent omission to perform a legal duty. *Rolfes v. State*, 10 Md. App. 204; *State v. Gibson*, 4 Md. App. 236. To this basic definition some authorities add the qualification, as to the first

class of involuntary manslaughter, that the unlawful act be *malum in se*, and not merely *malum prohibitum*, and as to the second and third classes of the offense, that the negligence be criminally culpable, *i.e.*, that it be gross. *Gibson v. State, supra*, at page 242.

It is well settled in this State that where a charge of involuntary manslaughter is predicated on negligently doing some act lawful in itself, the negligence necessary to support a conviction must be gross or criminal, *viz.*, such as manifests a wanton or reckless disregard of human life. *Palmer v. State*, 223 Md. 341; *Craig v. State*, 220 Md. 590; *Chase v. Jenifer*, 219 Md. 564; *Allison v. State*, 203 Md. 1; *Neusbaum v. State*, 156 Md. 149; *Morris v. State*, 4 Md. App. 328. A causal connection between such gross negligence and death must exist to support a conviction, although it is not essential that the ultimate harm which resulted was foreseen or intended. *Palmer v. State, supra; Craig v. State, supra; State v. Gibson, supra.* On the other hand whether an accused's conduct constituted gross negligence must be determined by the conduct itself and not by the resultant harm. See *Commonwealth v. Welansky*, 55 N.E.2d 902 (Mass.); *People v. Villalobos*, 25 Cal. Rptr. 111 (Calif.). Nor can criminal liability be predicated on every careless act merely because its carelessness results in injury to another. *People v. Sikes*, 159 N. E. 293 (Ill.).

It is likewise clear, as we observed in *Gibson*, that the Maryland cases have generally recognized that a charge of involuntary manslaughter at common law could in some circumstances at least be based on the doing of an unlawful act. In *Neusbaum v. State, supra*, the court, in defining a felonious homicide, characterized the crime so as to include those cases where one takes the life of another unintentionally and without excuse ."while needlessly doing anything in its nature dangerous to life, or who causes death by neglecting a duty imposed either by law or by contract, or in the course of committing a crime or even a civil wrong." 156 Md. at page 155. To like effect, the court in *Insurance Company v. Prostic*, 169

Md. 535, in discussing a felonious homicide, held at page 539 that "when the person acting has no intention to injure anybody, but death is the result of unlawful action endangering life, there is manslaughter, at least."

We said in *Gibson* (4 Md. App. 243) :

> "*Neusbaum* and *Prostic* seemingly share a common thread—that where a prosecution for involuntary manslaughter is based on the commission of an unlawful act causing death, the act must itself be dangerous to life. As the *Prostic* court observed, if the person causing the death of another 'intends to do an unlawful and wrongful act, which is punishable because it is wrong in itself, and in doing it he inflicts an unforeseen injury, he is criminally liable for that injury' [since] '[t]here are many acts so heedless and incautious as necessarily to be deemed unlawful and wanton, though there may not be any express intent to do mischief, and the party committing them causing death by such conduct will be guilty of manslaughter.' 169 Md. at page 539."

While appellant's action in carrying his father's gun to the dance was undoubtedly unlawful, [1] we think it clear that the trial judge did not base his conviction on the ground that the killing occurred in the course of appellant having committed an unlawful act not amounting to a felony; rather, it appears that the court based its involuntary manslaughter finding on the principle that appellant was grossly negligent in his handling of the loaded gun, a dangerous act which, in the circumstances, manifested a reckless and wanton disregard of human life. Accepting the trial judge's factual finding that Hunter slapped or pushed the gun away from him when appellant pointed it in his direction does not, as appellant

---

1. Appellant's taking of the gun for the avowed purpose of selling it likely constituted a larceny; appellant's concealment of the gun on or about his person, together with his possession of it, likely constituted violations of Maryland Code, Article 27, Section 36 and Sections 441-448, the latter dealing with violation of the Maryland gun regulation laws.

suggests, compel the conclusion that he is exempted from criminal responsibility by reason of Hunter's supervening act. In the circumstances of this case, the introduction of the loaded weapon into a small room among five youths drinking liquor from a bottle, and the handling of the weapon by a person unfamiliar with its operation, including its loading and unloading, is plainly a grossly negligent act dangerous to life and Hunter's reaction when the gun was pointed in his direction was wholly predictable. Although Hunter's action may have been a contributing factor in causing appellant to drop the gun, it does not in our judgment constitute such a supervening cause, independent of appellant's actions, as would break the causal connection between appellant's gross negligence and the resulting death of the victim.[2] Accordingly, we cannot say that the trial judge was clearly erroneous in finding appellant guilty of involuntary manslaughter.

*Judgment affirmed.*

---

2. Neither Hunter nor Overton in their statements gave any indication that Hunter slapped the gun from appellant's hand. Rather, their statements indicated that appellant simply dropped the weapon in the course of handling it. The trial judge apparently gave no credit to either statement.