594 A.2d 109

Russell Lynn DUCKWORTH

v.

STATE of Maryland.

No. 117, Sept. Term, 1990.

Court of Appeals of Maryland.

Aug. 23, 1991.

Gary S. Offutt, Asst. Public Defender and George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender, all on brief), Baltimore, for petitioner.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ., H. CHESTER GOUDY, Jr., Judge of the Fifth Judicial Circuit of Md., Specially Assigned, and ERNEST A. LOVELESS, Jr., Administrative Judge of the Seventh Judicial Circuit of Md., Specially Assigned.

RODOWSKY, Judge.

Petitioner, Russell Lynn Duckworth (Duckworth), while handling a pistol, shot and seriously wounded a child who was in his custody. A jury in the Circuit Court for Allegany County found Duckworth guilty of child abuse and battery. The Court of Special Appeals affirmed in an unreported opinion. We granted Duckworth's petition for certiorari to consider two issues:

"1. Did the trial court err when it admitted evidence of a prior accidental shooting?

"2. Was the evidence sufficient to sustain Petitioner's convictions?"

The shooting charged in the indictment occurred on January 28, 1988. Miranda Bergdoll (Mandy), age three years and eight months, was in her mother's apartment on Beall Street in Cumberland. Mandy's mother, Susan Ann Bergdoll (Bergdoll), was at work. Mandy's father was in prison. Mandy was in the care of Duckworth, who also resided there and whom Bergdoll married by the time of trial. There were no other persons in the apartment when the shooting occurred.

The Bergdoll apartment consisted of the entire second floor of a small, two-story building. The front door of the apartment was at the bottom of the stairs which accessed the second floor hallway. Four rooms opened off the hall. Progressing from rear to front they were a kitchen in the rear, bedroom one, bedroom two, and a bathroom in the front.

Based upon a lengthy statement in question and answer form which Duckworth gave to the police, and which was audio recorded and transcribed, the jury could have found the following facts.[1] Duckworth was standing in the kitchen while running water for his bath in the bathroom. For no reason that he could articulate, Duckworth reached to a shelf above the refrigerator and took down a holstered Smith and Wesson, .44–caliber, magnum revolver. He said that " 'the gun was loaded, and I forgot about it.' " He took the weapon out of the holster. While holding the holster in one hand and the pistol in the other, he attempted to release the cylinder, but the revolver would not open. While Duckworth held the gun Mandy said, " ' "Don't shoot me." ' " Duckworth said, " ' "Mandy, I'm not going to

---

1. Only portions of the statement were introduced at trial. They were read to the jury by Officer William M. Abe, Sr., a witness for the State, from the transcript made from the audio recording.

shoot you." ' " At that point Duckworth asked Mandy to turn the water off in the bathroom. She started down the hall, turned around, and seemed about to cry. Duckworth had his thumb on the hammer of the pistol. Mandy asked if Duckworth wanted her to turn the light on. Duckworth " 'hollered at her for turning all the lights on, 'cause her mother bitches because we got to pay the bill.' "

Mandy said, " ' "Don't shoot me," ' " and Duckworth said, " ' "Honey, I won't shoot you," ' " when Duckworth " 'let go [of the hammer], and the gun went off.' "

The handgun was loaded with bird shot in .44–caliber casing. Mandy was approximately ten feet away, standing between the doors to the bedrooms. She was hit by over fifty pellets of shot in the chest, neck, right arm, and some inside of the mouth. Some of the pellets lodged in the heart muscle. Mandy was standing between bedroom one and bedroom two, nearer bedroom two. Duckworth was standing in the kitchen. In the wall between where Mandy was standing and the frame of the doorway of bedroom one twenty-seven other pellets were clustered in an area approximately fifteen inches wide extending from a low point of fourteen inches to a high point of twenty-five inches above the floor. There were only eight pellets imbedded in the frame of the doorway to bedroom two.

Duckworth rushed Mandy to a hospital in Cumberland. Because of the injury to the heart muscle, Mandy was transferred to a hospital in the District of Columbia. She eventually made a complete recovery.

An expert from the Federal Bureau of Investigation who examined the handgun testified for the State. The weapon could be fired in single or double action modes. In the double action mode, pulling the trigger causes the hammer to rise, subsequently to release, and to fire the cartridge. This mode of firing requires 11.5 pounds of pressure on the trigger. In the single action mode, used for target shooting, the hammer is first cocked, and then the trigger pulled.

The single action mode of firing requires 3.25 pounds of pressure on the trigger.

The expert further testified that one of the safety features of the weapon is a hammer block which prevents the hammer from striking the cartridge unless the trigger is pulled. The witness tested that safety feature by striking the end of the hammer spur, using a leather mallet with a considerable amount of force, while the hammer was in the cocked position. The witness was able to cause the weapon to fire on three out of thirteen attempts with hammer blows. At that point a blow broke the hammer spur. In the witness's opinion it was not possible for the weapon to go off, without pulling the trigger, when the hammer was cocked, "absent some unusual circumstances," similar to those described in his test.

At the time of the January 28, 1988, incident Duckworth, Bergdoll, and a house guest had four guns in the apartment, the .44-caliber magnum handgun, a Marlin, .22-caliber, scope rifle, a black powder pistol, and an old, Ruger, black powder, muzzle loader. Duckworth and the house guest had been out target shooting together a few days before the incident. The day of the incident, Duckworth showed Bergdoll how to load and use the .44-caliber handgun for her own self-defense.

At a point some forty pages into his statement to the police, Duckworth was asked again to describe the shooting.

" 'Q ... Just take your time and tell me what happened. Get it off your chest.'

" 'A She was scared of me.'

" 'Q Okay. I realize that.'

" 'A And she's scared of it. And she's like, "Don't shoot me." And I'm like, "I ain't going to shoot you." And she said ... "You just said...." She just said, "Don't shoot me." And I said, "I'm not going to shoot you." And she was trying to cry. And I said, "If you don't quit crying, I'll shoot you." '

" 'Q Okay.'

" 'A And I was standing there with it like that in my hand. I told you I had the holster in my left hand and the pistol was in my right hand....'

" 'Q And you was thinking the gun was unloaded?'

" 'A Right.'

" 'Q And that's when the damn thing went off?'

" 'A Right. Officer Abe, there's no way in hell I ...'

" 'Q [Duckworth], I believe that you didn't mean to shoot the girl. Do you understand what [Mandy] thinks?'

" 'A She thinks I just said, "Hey, Mandy, you're bad and I'm going to shoot you." ' "

Mandy's mother testified in the defense case. On cross-examination by the State, the following transpired which gave rise to the first issue presented by Duckworth in his certiorari petition.

"Q Mrs. Duckworth, had there ever been any other accidents involving [Duckworth] and your daughter?

"[DEFENSE COUNSEL]: Objection.

"A No sir. Except for the shooting.

"Q Except for this shooting, there had never been another accident?

"A Between ...

"[DEFENSE COUNSEL]: Objection. She asked and answered the question.

"BY THE COURT: Objection sustained.

"Q Approximately a week before, wasn't there an incident with a BB gun?

"[DEFENSE COUNSEL]: Objection.

"BY THE COURT: Objection is overruled.

"A Is that answer or don't answer?

"BY THE COURT: Answer.

"A Yeah. I was there. The BB hit the chair and then it hit her. He didn't stand there and hit her with it first.

"Q You were there in the room when it happened?

"A I was in the bathroom. But if you would like to go see my kitchen chair, I'll take you over and show you.

"Q Ma'am, the question was, were you in the room when it happened?

"A I was in the bathroom."

The jury found Duckworth not guilty of assault with intent to maim and of use of a handgun in a crime of violence, but the jury found Duckworth guilty of child abuse and of battery. The trial court merged the convictions.

Duckworth's position is that "the ultimate issue in the case is whether the State proved beyond a reasonable doubt that [Duckworth] intentionally shot Miranda Bergdoll; if the shooting was accidental, [Duckworth] did not commit a crime." He submits that "whether the State proved intent beyond a reasonable doubt resolves to whether the expert's testimony excluded any reasonable possibility other than [Duckworth's] intentionally pulling the trigger." Brief of Petitioner at 11–12. Within that framework, Duckworth argues that "[w]hether [Duckworth] had been involved in prior accidents was irrelevant to whether he *deliberately* shot Miranda Bergdoll," and thus, Bergdoll's testimony, quoted above, was inadmissible. *Id.* at 7. We reject the premise of this analysis, because it ignores the role of criminal negligence in criminal battery and in child abuse.

I

■ On the charge of battery, the trial court instructed the jury that

"in order to convict the Defendant of battery, the State must prove the following elements: that the Defendant caused physical contact or harm to the victim; that the contact was the result of an intentional and reckless act of the Defendant and was not accidental, and that the contact was not legally justified." [2]

2. The trial court was using as a model Maryland State Bar Association, Inc., *Maryland Criminal Pattern Jury Instructions,* No. 4:04 (1986). MPJI–Cr. 4:04 states that the contact may be the result of "an intentional or reckless act." The portion of the transcript of the

Under the evidence presented in the instant matter, the jury could have found that Duckworth pointed the revolver at Mandy. The physical evidence clearly demonstrates that the weapon was pointing directly at Mandy when it fired. There is direct evidence in Duckworth's statement that Mandy was pleading with Duckworth not to shoot her and that he threatened to shoot her if she did not stop crying. From this the jury could infer that Duckworth intentionally pointed the handgun at Mandy while he was threatening to shoot her.

That is precisely how the State argued to the jury. Emphasizing the recklessness element of an alternative method of proving battery, the State argued: "Again ... is it reckless to point a gun, whether or not you believe it loaded or unloaded, at anyone, little [sic] alone a three year old infant[?]"

## II

"In most jurisdictions today battery may be committed by conduct amounting to criminal negligence which legally causes an injury." W. LaFave & A. Scott, *Handbook on Criminal Law* § 81, at 605 (1972) (footnote omitted). And *see* 2 C. Torcia, *Wharton's Criminal Law* § 178, at 296 (14th ed. 1979) ("[A] criminal battery is committed, in accordance with the prevailing view ... if the contact was the result of [the defendant's] recklessness or criminal negligence. The inclusion of the latter mental state is sound and complements logically the mental state which supports manslaughter liability."); R. Perkins & R. Boyce, *Criminal Law*, at 157 (3d ed. 1982) ("For battery, as for manslaughter, more is required than ordinary negligence sufficient to support a civil action. But the rule is now well established that conviction of battery can be supported by harm to the person resulting from criminal negligence." (Footnotes

charge, quoted above, may have incorrectly reported "or" as "and." Referring to the court's instruction while arguing to the jury, the State's Attorney used "or." There was no objection.

omitted)); Clark & Marshall, *A Treatise on the Law of Crimes* § 5.09, at 294 (M. Barnes 7th ed. 1967).

A leading case in the area of criminal negligence is *Commonwealth v. Hawkins*, 157 Mass. 551, 32 N.E. 862 (1893), where the defendant was convicted of assault with a deadly weapon. Persons had been annoying the defendant Hawkins by ringing his doorbell and insulting him when he came to the door. He went into the street with a pistol, in a thickly settled area of Fall River, at night, looked up and down the street, saw no one, and fired the pistol, pointing it toward the ground, to let the persons who had been annoying him know that he had a pistol, and in order to deter them from further annoying him. The shot apparently ricocheted and struck one Mary A. Powers who was standing over 200 feet away. In sustaining the conviction the court said:

"It is a general rule in criminal proceedings at common law that the defendant cannot be convicted unless a criminal intent is shown, but it is not necessary that he should have intended the particular wrong which resulted from his act.... So, in cases of homicide, the rule is well established, that one who wantonly, or in a reckless or grossly negligent manner, does that which results in the death of a human being, is guilty of manslaughter, although he did not contemplate such a result. His gross negligence in exposing another to a personal injury by intentionally doing the act makes his intention criminal, and supplies all the intent which the law requires to make him responsible for the consequences. This principle is equally applicable to other cases where a personal injury results from a wanton or reckless act which is likely to do bodily harm, or from any gross negligence which causes the danger. In the case at bar, if Mary A. Powers had died from the pistol shot, the defendant, on the facts found by the jury, would have been guilty of manslaughter. As she survived the injury, the same principle now requires a conviction of assault and battery."

*Id.* at 553, 32 N.E. at 863 (citation omitted). And *see Bentley v. Commonwealth*, 354 S.W.2d 495, 496 (Ky.1962) ("We do not find that negligent wounding, as such, was a crime at common law unless the defendant's conduct was so wanton and in disregard of the probable consequences to others that it was considered to be willful, in which event it was an assault and battery.").

### III

■ Excluding those situations in which one who is holding a loaded firearm might be, or become, justified in using it as a weapon, the act of pointing a firearm at a nearby human being, without being certain that the weapon will not discharge, generally is sufficiently reckless to support a conviction for voluntary manslaughter where the unintended discharge of the weapon results in death. Similarly, here, where the discharge of the weapon resulted in a wounding short of death, the same degree of recklessness supports the battery conviction.

In *Rampton's Case*, Kelyng J. 41, 84 Eng. Rep. 1073 (1664), Rampton, a hackney coachman,

> "found a soldier's pistol in the street, and when he came home he shewed to his master, and they took the gunstick and put it into the pistol, and it went down into the mussel of the pistol, by which they thought it was not charged, and his wife standing before him, he pulled up the cock and the pistol went off"

killing Rampton's wife. This was held to be manslaughter and not "misadventure." *Id.*

Chief Judge Murphy, writing for the Court of Special Appeals, dealt with circumstances analogous to those before us in *Mills v. State*, 13 Md. App. 196, 282 A.2d 147 (1971), *cert. denied*, 264 Md. 750 (1972). The defendant and four other teenage males, while attending a dance, went into a small rest room to share a bottle of liquor. Mills, who was carrying a .22-caliber automatic pistol, displayed it and may have been attempting to load or unload it. While the pistol was pointing at one Hunter, the latter slapped or

pushed it away from him. The weapon fell to the floor, discharged, and killed one of the other youths. The Court of Special Appeals sustained Mills's conviction of involuntary manslaughter. The court reasoned that "the introduction of the loaded weapon into a small room among five youths drinking liquor from a bottle; and the handling of the weapon by a person unfamiliar with its operation, including its loading and unloading, is plainly a grossly negligent act dangerous to life and Hunter's reaction when the gun was pointed in his direction was wholly predictable." *Id.* at 202, 282 A.2d at 150.

In *People v. Andersch,* 107 Ill.App.3d 810, 63 Ill.Dec. 551, 438 N.E.2d 482 (1982), the defendant was convicted of involuntary manslaughter for a shooting death that occurred after the defendant pointed his rifle at a group of unruly persons in the corridor of the Y.M.C.A. where he lived. The defendant argued that he did not realize the rifle was loaded. The court said that "[i]t is settled that pointing a loaded weapon at another constitutes recklessness since it is a gross deviation from the standard of care exercised by a reasonable person," and that "the trier of fact could have properly determined that the defendant acted recklessly in not checking the condition of the weapon prior to the incident." *Id.* at 818, 63 Ill.Dec. at 557, 438 N.E.2d at 488.

To the same effect *see Goffer v. State,* 430 So.2d 896 (Ala. Crim. App.1983); *Slay v. State,* 508 So.2d 1268 (Fla.App. 1987); *Navarro v. State,* 433 So.2d 1011 (Fla.App.1983); *People v. Schwartz,* 64 Ill.App.3d 989, 21 Ill.Dec. 765, 382 N.E.2d 59 (1978); *People v. Carlton,* 26 Ill.App.3d 995, 326 N.E.2d 100 (1975); *State v. Hardie,* 47 Iowa 647, 29 Am. Rep. 496 (1878); *State v. Barberousse,* 458 So.2d 569 (La. App.1984), *aff'd,* 480 So.2d 273 (1986); *Hunter v. State,* 647 S.W.2d 657 (Tex.Crim.App.1983); *Giles v. State,* 617 S.W.2d 690 (Tex.Crim.App.1981). And *see* Annotations, *Homicide by Wanton or Reckless Use of Firearm Without Express Intent to Inflict Injury,* 5 A.L.R. 603, 610–19 (1920); 23 A.L.R. 1554, 1556–57 (1923).

■ Thus, the State's theory of the case on the battery charge was legally sound, namely, that Duckworth criminally wounded Mandy by recklessly handling a firearm. It follows that the testimony by Mandy's mother concerning an accidental shooting with a BB gun approximately one week prior to the battery was clearly relevant. Mandy was struck by a BB on the earlier occasion—precisely where, we do not know. The jurors might well reason that one in the position of Duckworth would be relieved that the accidental discharge of the BB gun had not blinded Mandy. Certainly, the jury could conclude that the accidental discharge of the BB gun in the earlier incident was a warning to Duckworth that should have reinforced the need for substantial caution when handling firearms. Duckworth's failure, on the occasion of the shooting charged in the indictment, to heed that warning exacerbated the recklessness involved in the crime charged.

## IV

■ Bergdoll's testimony concerning the accident with the BB gun was also relevant to the charge of child abuse, and there was sufficient evidence of child abuse. Child abuse includes "[t]he sustaining of physical injury by a child as a result of cruel or inhumane treatment ... by any ... person who has ... temporary care or custody or responsibility for supervision of a child under circumstances that indicate that the child's health or welfare is harmed or threatened thereby." Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 35A(a)(2)(i).

■ There was sufficient evidence for the jury to find that Duckworth intentionally pointed the weapon at Mandy to make her stop crying while she, after having previously been struck by a projectile from a gun handled by Duckworth, was pleading with him not to shoot her. On that view of the evidence, which we do not imply is the only legally sufficient interpretation of the facts, the offense

was complete before the weapon discharged, even if the discharge was not consciously intended.

In *Bowers v. State*, 283 Md. 115, 389 A.2d 341 (1978), we considered the meaning of "cruel or inhumane treatment" in the context of a fifteen year old who had been beaten with a belt fifteen to twenty times on the back, neck, arms, and legs. We presented the Maryland child abuse statute against the background of the common law relating to parental discipline. We said:

> "[W]here corporal punishment was inflicted with 'a malicious desire to cause pain' or where it amounted to 'cruel and outrageous' treatment of the child, the chastisement was deemed unreasonable, thus defeating the parental privilege and subjecting the parent to penal sanctions in those circumstances where criminal liability would have existed absent the parent-child relationship. Put another way, a parent was not permitted under the common law to resort to punishment which would exceed 'that properly required for disciplinary purposes' or which would extend beyond the bounds of moderation. 'Excessive or cruel' conduct was universally prohibited."

*Id.* at 126, 389 A.2d at 348 (citations omitted). We concluded that the terminology employed in the child abuse statute "appears to be nothing but a codification of the common law principles concerning the limits of permissible parental chastisement." *Id.* at 127, 389 A.2d at 348. Here, the jury could conclude under all of the circumstances that pointing the handgun at Mandy in order to make her stop crying was not only excessive or cruel, but, in view of her recently having been shot by a BB, sadistic.

Mandy's physical injury resulted from the cruel or inhumane treatment. This shooting of Mandy is more directly the result of Duckworth's pointing the weapon at her than was the shooting of the victim in *Mills v. State, supra*, 13 Md. App. 196, 282 A.2d 147, where the weapon was knocked to the floor after having been pointed at another person. Even if Duckworth did not intend to fire the weapon, the physical injury sustained by Mandy is a natural conse-

quence and the proximate result of his threatening and reckless conduct.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.