661 A.2d 702

**E. George ELIAS**

v.

**STATE of Maryland.**

**No. 45, Sept. Term, 1994.**

Court of Appeals of Maryland.

July 18, 1995.

Anton J.S. Keating (George McDowell, on brief, Baltimore, John T. Wright, on brief, Rockville), for appellant.

Angus R. Everton, General Counsel, Baltimore, amicus curiae for The Medical and Chirurgical Faculty of Maryland.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., of Maryland, on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

We here focus upon the crime of common law battery and whether on the record in this case, the defendant, a surgical oncologist, was properly found to have committed that offense when, in the course of a medical examination upon a patient complaining of painful breasts, he touched another sensitive part of the patient's body without her express permission.

I

On March 3, 1993, Eliza Doreen Hancock applied to a District Court Commissioner for a Statement of Charges, naming Dr. E. George Elias, a surgical oncologist, as the defendant. In her application, Hancock related that on January 5, 1993 she went to Dr. Elias for a breast examination, during which she partially undressed. She said that Dr. Elias noted some white spots on her right thigh and she opened and pulled her slip up to permit him to better see the spots. She said that Dr. Elias then asked her to remove her dark pantyhose so that he could better examine the white spots and she complied. Hancock further asserted in her application that Dr. Elias did not show any great concern about the white spots but asked her to lie down so that he could finish his breast examination. She said that, at that point, Dr. Elias "slipped his hand into my panties without any gloves on"; that she "jumped" and asked him "what was he doing in my vaginal area," to which he replied that he was "checking for melanoma which was oftentimes found in black women." When she asked him why he was not wearing gloves, he replied "a woman is a woman," after which he washed his hands and

discussed treatment with her for her breasts. Thereafter, according to Hancock's application, she left the office "very uncomfortable about what had happened" and did not go to work the next day. She said that she talked to several medical personnel who told her that melanoma is never found in the vaginal area. She said that in Dr. Elias's report to her gynecologist, no mention was made of melanoma.

Based on her application, a criminal summons was issued on March 8, 1993, charging Dr. Elias with (1) violating Maryland Code (1957, 1992 Repl.Vol.) Art. 27, § 464C (fourth degree sexual offense)[1] in that he engaged in "sexual contact" with Ms. Hancock and (2) with having committed a common law battery upon her on the same date.

Trial was held in the District Court sitting in Baltimore City on April 9, 1993. Ms. Hancock, a clinical social worker at the University of Maryland Medical Systems, testified substantially in accordance with the averments set forth in her Application for a Statement of Charges. She acknowledged that before Dr. Elias undertook to examine her breasts, she told him she had lupus,[2] and also a number of white spots on her upper right thigh, which had been earlier diagnosed as vitiligo.[3] Ms. Hancock testified that Dr. Elias then examined her breasts in the course of which he said he wanted to see the white spots and she removed her stockings and slip, leaving on her underpants. She said that after Dr. Elias confirmed the diagnosis of vitiligo, he finished his breast examination by having her lie down on the table. She said that before she knew it, Dr. Elias "had his hands in my underwears" and "was

---

1. A sexual offense in the fourth degree, insofar as here pertinent, is committed under this section if a person engages "in sexual contact with another person against the will and without the consent of the other person."

2. Lupus signifies an erosion of the skin. The term is used to designate a group of skin diseases of destructive and intractable character. *Black's Medical Dictionary,* 526–527 (31st ed. 1976).

3. Vitiligo is the term given to a skin disease in which smooth, light-colored patches appear either on the skin or in the hair. *Black's Medical Dictionary, supra,* at 910.

so quick that he was over to the other side before I could say what are you looking for." Ms. Hancock said that he opened her labium area; that his hands entered the folds of her vagina; and he said that he was checking for melanoma [4] but that she didn't have it. As to how long he had his hands in her underwear, she said "it was very quick, very fast" and caught her off guard. Ms. Hancock expressed concern that Dr. Elias was not wearing gloves; that she did not give him permission to touch her in the vaginal area, and that no one else was present in the examination room other than Dr. Elias and herself.

Dr. Elias, testifying in his own behalf, stated that he was the Director of the Oncology Department at the University of Maryland Medical Systems since 1977, as well as a professor of surgical oncology and President of the American College of Surgery, Maryland Chapter. He indicated that he sees roughly two thousand patients each year of whom 70% are women, and he has never had any patient complaints of improprieties filed against him. He indicated that he first saw Ms. Hancock professionally on January 5, 1993 for evaluation of her sore breasts. He stated that his technique in examinations was to have the patient sit on the side of the table and he would first examine lymph glands in the neck above the collarbone and thereafter the armpits and the axilla for lymph nodes. He said Ms. Hancock came to him with a history of hair loss and vitiligo but with no family history of breast cancer. He said he then had his patient lie down for the breast examination which consisted of examining her breasts, first with arms down, then with arms up to stretch the breasts over her muscles. He advised Ms. Hancock that she has a condition called sclerosendinosis which is similar to fibrocystic disease. Elaborating, Dr. Elias said that this was a thickened breast, tender just before her period and comes and goes, and if it becomes severe, he would prescribe several drugs. Be-

---

4. Melanoma is a cancer of the skin—a tumor arising from the cells that produce melanin. A highly malignant form, known as malignant melanoma, arises from the pigmented cells of moles. *Black's Medical Dictionary, supra,* at 542.

cause Ms. Hancock was not that tender, Dr. Elias told her that no medical intervention was necessary. He said that the lumps Ms. Hancock was feeling were part of the scarring in the breasts containing the cysts. He told her that he would write to her gynecologist, Dr. Johnson, pertaining to the results of her breast examination.

Dr. Elias further testified that as he was leaving the examination room, Ms. Hancock stood up, pulled her hospital gown back, and showed him the vitiligo on her thigh, asking his opinion of it. Dr. Elias explained that vitiligo is a "whitish depigmentation; the area is white and without pigment." He said it could be a sign of melanoma even if it has been present for some time. He said he looked at it through her dark pantyhose and because he could not see it well, he asked her to pull her pantyhose down and lie down on the table to enable him "to feel the area and the groin." Dr. Elias stated that it was very rare for a black person to get melanoma in the black skin but such cases had been reported about 126 times. Melanoma, he said, was twenty times more common in white than black persons and was very deceiving in the black population. He referred to one of his own patients, a sixty-six-year-old black man with lupus and vitiligo who had an enlarged lymph gland in his groin which was excised and diagnosed as an aplastic cancer in his thigh. Dr. Elias said that as a result of such cases, when he sees a patient with vitiligo in the same area, he becomes concerned and feels the entire vitiligo area. He said he did so with Ms. Hancock but found no nodules or anything suspicious in her case. He said that because of her history of lupus, he had palpated "the groin lymph nodes" on both sides to assess whether they were enlarged, but did not "get under her pants or near her vulva."[5] He said that if he felt an enlarged lymph gland, it could signify lupus or melanoma. During the examination, Dr.

---

5. "Groin," as defined in *Black's Medical Dictionary, supra,* at 393, is "the name applied to the region which includes the upper part of the front of the thigh and lower part of the abdomen. A deep groove runs obliquely across it, which corresponds to the inguinal ligament, and

Elias said he talked with Ms. Hancock about melanoma, explaining its rarity in the black population but that it could get to lymph glands and that was why he was examining those glands. He indicated that melanoma of the vagina and vulva is treated by gynecologists; that he never used the language attributed to him by Ms. Hancock that "a woman is a woman" and would not know what it meant. He said he never uses gloves to examine axilla or neck or groin but only if he is going to put his fingers within the rectum, or the vagina, which he did not do.

On cross examination, Dr. Elias stated that there was no one in the examining room when he examined Ms. Hancock; that it was consistent with his practice of not having another present during the examination unless the patient asked for a chaperon and then he would call in a nurse. He stated that only rarely does he do vaginal examinations, but on those occasions he does wear gloves and has a nurse present during the examination without the necessity of a request.

Dr. Elias acknowledged that Ms. Hancock did not tell him that the white spots were bothering her. He said he asked her whether they were getting bigger and she said she didn't think so but was uncertain. Dr. Elias said that he did not examine Ms. Hancock's feet for melanoma, where it sometimes appears, because she made no complaint concerning her feet, and had they been implicated, she would have limped. He also acknowledged not looking under her nails or in the palms of her hands and did not palpate these areas for melanoma where it is sometimes discovered. He emphasized that he felt for lymph glands in the groin area and while he knew that another doctor was treating Ms. Hancock for lupus, he said that as he was feeling her groin on the one side, he should feel the other side as well. He admitted that Ms. Hancock did not give him express consent to examine her groin area because she would not know that lymph glands would be in the groin area. Dr. Elias defined the groin area as below her under-

---

divides the thigh from the abdomen. The principal diseased conditions affecting this region are enlarged glands."

pants and vulva. He said that he did not get near the outer fold of the labia because it was covered by her slip and underpants. He said that the groin was not as sensitive as the vulva and he acknowledged moving his hands around Ms. Hancock's groin area, and that he did not use gloves in this examination. He told Ms. Hancock that he felt no lumps, and he advised her to see Dr. Johnson if there was any change in the vitiligo in her skin.

At the conclusion of all the evidence, the trial judge made these findings: He first stated that Ms. Hancock and Dr. Elias were equally honest and credible. He remarked that the doctor used no gloves during his examination, although the patient expected that he would do so if he touched her in the vaginal or groin area. Referring to Dr. Elias's testimony, the trial judge said that gloves were not required because Dr. Elias "never touched any type of area that would be considered to be an internal sort of examination and as a consequence there was none necessary." Dr. Elias, the trial judge said, "spent most of his life helping others," and was "world renowned." He recognized that Dr. Elias has practiced medicine for many years without any complaints against him. The trial judge then said that there was probably a "misunderstanding" between doctor and patient. As to this, he opined that it was appropriate for Dr. Elias to examine the groin when he saw white spots; that "maybe you forgot to tell her that you had to touch this area, maybe you didn't." The trial judge expressed his belief that Dr. Elias was "such a great surgeon [that his] examination was more or less automatic." He found that Dr. Elias examined the subject area without express permission from Ms. Hancock to palpate her groin area or to touch the white spots at or about her vaginal or groin area.

The trial judge next gave his reasons for acquitting Dr. Elias of the fourth degree sexual offense. He concluded that, within the contemplation of the statute, there was no "sexual contact in the area where the doctor admitted he examined Ms. Hancock." He next found Dr. Elias guilty of battery which he defined as an "offensive touching against the will of

another person without their consent." He said that he didn't think that Dr. Elias did "anything wrong in the case, except to be so damn good as to be automatic in your examination." Continuing, the trial judge said:

"You saw a spot, the spot is right next to an area where you should examine, you touched that area, it shocked Ms. Hancock and as a consequence we find ourselves here at this time."

In finding Dr. Elias guilty of common law battery, the court remarked that he was "guilty in the least most way of an offensive touching of Ms. Hancock . . ., an oversight on your part as opposed to anything that is actually intentional . . ., not the fault of any particular person." The trial judge thereafter stated that Dr. Elias was guilty "in a most technical sort of sense," and this finding would provide Ms. Hancock "with some relief with what I hope is a very neutral overview of all the testimony." Summarizing, the court opined that it was all "a misunderstanding" in that Dr. Elias "simply surprised [Ms. Hancock]." The court imposed a $100 fine as its sentence for the battery conviction, following which Dr. Elias appealed to the Circuit Court for Baltimore City, electing a non-jury *de novo* trial.[6]

## II

At the *de novo* trial, Ms. Hancock told the court that she was a clinical social worker at the University of Maryland

---

6. We are at a loss to understand how the District Court judge could have found Dr. Elias guilty of criminal battery after concluding that he believed Dr. Elias's testimony and, consequently, that he did "nothing wrong"; that he never touched any area of Ms. Hancock's body that was "internal"; that it was appropriate, in the circumstances, for Dr. Elias to examine Ms. Hancock's groin area; and that the touching described by Ms. Hancock in her testimony was not intentional but rather was an "oversight."

Had Dr. Elias sought an appeal on the record, rather than *de novo*, and the State so agreed, there could be no doubt that the circuit court could not have found Dr. Elias guilty beyond a reasonable doubt. *See* Maryland Courts and Judicial Proceedings 12–401(f), which provides that "in any case in which the parties so agree, an appeal [to the circuit court] should be heard on the record made in the District Court."

Medical Systems involved in the treatment of infectious diseases. She possessed an A.A. degree in Human Services, a Bachelors degree in Social Work and was a certified social worker. She had graduated from the Community College of Baltimore and Morgan State University. At the time she saw Dr. Elias on January 5, 1993, it was stipulated between counsel that federal regulations required that gloves be worn by physicians when "it is reasonably anticipated" that the physician may have "hand contact with blood or other potentially infectious materials, mucus membranes or non-intact skin." Ms. Hancock related her medical history to the court, explaining that she had loss of hair and joint pains and had been diagnosed as having lupus. She consulted Dr. Elias because her breasts were painful. She said she had no prior personal or professional relationship with him. When she arrived at Dr. Elias's office, she completed a medical form given to her by a receptionist preliminary to Dr. Elias's examination. A nurse subsequently took her blood pressure and she told the nurse that she was taking the drug Plaquenil. She then undressed from the waist up and put on a hospital gown; she kept on her pantyhose and half slip. The gown opened in front for her breast examination. She said that when Dr. Elias entered the examination room, he questioned her about taking the drug "Plaquenil" and she told him it was for her lupus; that she had a "white spot" on her leg which had been there since she was a young child and which was "connected" with the lupus. About the skin discoloration, she told Dr. Elias that the white spot had been diagnosed as "vitiligo." The spot was located on the side of her right upper thigh and had not changed from her childhood days. She said she had no concern about the white spots and no pain emanated from them. Her appointment with Dr. Elias, she said, was solely for a breast examination. According to Ms. Hancock, after Dr. Elias took her medical history, he had her sit on the side of the table and he examined her breasts by touching and squeezing them for "knots." He then said he wanted to see the spots on her leg and she pulled her slip up on the right side and showed him the spots. She said Dr. Elias then asked

her to remove her stockings because "he could not see the spot because my stockings were too dark." She said she complied and that her "slip and stockings came off," and Dr. Elias looked at the spot and said "that is just vitiligo." Dr. Elias then told her to lie down so he could finish his breast examination. She did so, she said, placing her hands behind her head. "Then," she said, "out of nowhere, the doctor's hand went in the right side of my panties." She elaborated by stating that Dr. Elias "checked" my labia area on the right side "where you open it up at." She answered in the affirmative the question whether this was "to the right side, your labia into your vagina area." Asked what part of Dr. Elias's hand "was in this labia," she said, "he used his fingers to open them up."

Continuing her testimony, Ms. Hancock said that when she asked Dr. Elias what he was doing, he "quickly . . . went to the other side." He said he was "checking" for melanoma which had been found in black women in "places like that." Ms. Hancock said she did not then know what melanoma was and asked him why he didn't wear gloves during his examination. After Dr. Elias washed his hands, he made the comment that "a woman is a woman," and that she did not appear to have melanoma. She said he did not check any other parts of her body for melanoma. Ms. Hancock reported this incident to the hospital and several months later, on March 3, 1993, she decided to file a statement of criminal charges against Dr. Elias which her girlfriend wrote out for her and which she signed. While she acknowledged reading the Statement of Charges "vaguely," this was because she was somewhat nervous at the time. She said she was uncomfortable and unable to rest between the date of the examination and the date she filed the charges because Dr. Elias had not worn gloves and that she was concerned that in filing charges she was going against the system because [she] was employed at the University of Maryland Hospital. She said that at some point she talked to her supervisor, who reported the incident to Risk Management, and also sought "counseling" at the hospital. She said that Dr. Elias, after completing her breast examina-

tion, outlined four options for her treatment but. made no mention of melanoma. She said she did not give Dr. Elias consent to put his hands into her panties and into her labia.

On motion for judgment of acquittal at the end of the State's case, Dr. Elias's attorney said to the court that he needed to review his notes. The court, in response, asked, "why," saying, "the woman said the man touched her" and "what [more] do you need." The court denied the motion.

Dr. Elias's testimony in his own defense was largely a repetition of his testimony at the District Court trial. He recounted that Ms. Hancock's medical history, which he reviewed before undertaking the breast examination, revealed that she had lupus and vitiligo, and that he talked with her about these conditions. He said that after he had completed his breast examination, Ms. Hancock asked for his opinion about her vitiligo. Dr. Elias said that he had her lie down on the table and felt the area of the vitiligo and her groin. He said that the purpose of making an examination of the groin was to prevent vitiligo from developing in the groin lymph glands. He said that he was familiar with cases where black individuals had developed melanoma in the groin area. To determine whether melanoma was present, Dr. Elias said he had to palpate the groin area on both sides to feel for enlarged glands to ascertain whether there was activity of lupus or melanoma cancer. In doing so, he said that it was necessary to move his hands about the groin area but that he did not reach under Ms. Hancock's underpants, get near her vulva or the outer folds of the labia. He said that during the examination, he explained to Ms. Hancock, that while melanoma was rare in black persons, particularly black women, it had occurred in such persons "with vitiligo and can go to the lymph glands." An illustrated medical text book was introduced in evidence, exhibiting the presence of melanoma in the groin area. Dr. Elias said he was not required to use gloves in this examination because he did not enter the vaginal area. When he found no evidence of melanoma, he advised Ms. Hancock to see her gynecologist or dermatologist if there were any changes in the pigment or in the vitiligo area. Dr. Elias said

that while he rarely does vaginal examinations, preferring to refer patients to gynecologists for this purpose, when, on rare occasions, he would undertake such an examination, he would always use gloves and have a nurse present.

It was stipulated between the parties that four women, employees of the hospital serving in Dr. Elias's office (two of whom were registered nurses), would testify that on an average Dr. Elias would see approximately 2,000 patients a year, roughly 70% of whom were women. It was further stipulated that these individuals had no knowledge of any complaints ever having been made by any patients for inappropriate behavior on Dr. Elias's part during a medical examination.

In closing argument at the conclusion of all the evidence, the State maintained that Ms. Hancock's testimony that Dr. Elias entered her groin and vaginal area without permission was entirely credible, and was fortified by the fact that Dr. Elias said nothing in his report to Dr. Johnson about melanoma. It argued that Dr. Elias's "idea that [Ms. Hancock] may have melanoma was just something amiss to hide behind whatever it was that [he] was doing at this point." Further, the State argued that Dr. Elias "touched her intentionally, without any accident." It said that Dr. Elias "had no right" to touch "one of the most sensitive areas" on Ms. Hancock's body. The State emphasized that Dr. Elias "put his hands in her vaginal area and that is a battery."

Dr. Elias, in his closing argument, denied touching the patient's vaginal area, acknowledging at the same time that he did palpate her groin area. He said that under Maryland law, battery is divided into two classes: (1) an intentional battery where a person intends to batter another—an unlawful touching in an angry, revengeful, rude, or insolent manner; and (2) an unintentional touching accompanied by criminal negligence associated with the touching. Dr. Elias also argued that there was implied consent to touch her groin area because Ms. Hancock asked him to examine her white spots and accommodated his examination by removing her clothing.

In its closing argument on rebuttal, the State maintained that to constitute a criminal battery, there need be no proof that the touching was in anger, but rather it is "simply from the element of battery itself that it has to be an unconsensual touching," whether an injury occurs or not. The State argued that the touching in this case was "offensive" because it was in her vaginal area and Dr. Elias "in fact ... had done this to her." The State argued that there was no implied consent to check her groin or vaginal areas and no express permission to do so.

Having heard the evidence, and the closing arguments of counsel, the court found Dr. Elias guilty of common law battery. In so concluding, it said only that it had considered "all the facts and circumstances in evidence," weighed the evidence, and judged the credibility of the witnesses. The court, in announcing its guilty verdict, then said: "[a]pplying the appropriate standard," as to "the charge of battery," the State "had proven its case beyond a reasonable doubt." The court imposed a $5000 fine upon Dr. Elias as its sentence.

### III

Dr. Elias filed a petition for a writ of certiorari, which we granted; it raised a number of issues which he claimed required reversal of the circuit court's judgment. His primary contention was that a physician who, during the course of a routine physical examination, failed to obtain the patient's specific consent to examine an area of the patient's body necessary for a competent medical examination, does not thereby commit the crime of battery. In this regard, Dr. Elias maintains that the State failed to prove an intentional battery at the trial in the circuit court. Moreover, he maintains that the State failed to prove an unintentional battery by simply showing that he touched Ms. Hancock without express permission, without wearing gloves, and without a chaperon present. Dr. Elias urges that such evidence, without more, does not prove either criminal negligence or lack of consent.

Elaborating on these contentions, Dr. Elias argues that the State is required to prove that he possessed the requisite *mens rea* to commit the crime. He says that the circuit court did not consider *mens rea* when analyzing whether he was guilty of battery and, consequently, he was convicted on evidence insufficient to support that verdict. He contends that the State must establish specific intent to obtain a conviction for battery and must, therefore, prove that he knowingly did commit an act which the law forbids, or knowingly failed to do an act which the law requires be done, purposely intending to violate the law. Dr. Elias suggests that the State presented no evidence that his touching of Ms. Hancock was unjustified and he focuses attention on what he deems to be the circuit court's analysis of the elements of the crime of battery, as requiring no more than a mere non-consensual touching.

## IV

In Maryland, battery is a common law misdemeanor which is generally defined as the "unlawful application of force to the person of another." *Epps v. State,* 333 Md. 121, 127, 634 A.2d 20 (1993) (quoting *Snowden v. State,* 321 Md. 612, 617, 583 A.2d 1056 (1991)). A criminal battery may be intentional or unintentional; there are two methods of proving the commission of the crime. More traditional is the intentional battery, described by Clark and Marshall, *A Treatise on the Law of Crimes,* § 10.19 (Melvin F. Wingersky Revision, 6th ed. 1958), as "[a]ny unlawful injury whatsoever, however slight, actually done to the person of another, directly or indirectly, in an angry, revengeful, rude, or insolent manner." We said in *State v. Duckett,* 306 Md. 503, 510, 510 A.2d 253 (1986), that "intent is an element of the crime of battery, [but] the intent need only be for the touching itself; there is no requirement of intent to cause a specific injury." *See also Biggus v. State,* 323 Md. 339, 351, 593 A.2d 1060 (1991). Accordingly, to be convicted of committing an intentional battery requires legally sufficient proof that the perpetrator intended to cause harmful or offensive contact against a

person without that person's consent and without legal justification.

An unintentional battery can arise from contact that is the result of a person's criminal negligence that legally causes injury to another. We have recognized that "[a] criminal battery is committed, in accordance with the prevailing view ... if the contact was the result of [the defendant's] recklessness or criminal negligence," and that the "inclusion of the latter mental state ... complements logically the mental state which supports manslaughter liability." *Duckworth v. State*, 323 Md. 532, 540, 594 A.2d 109 (1991) (quoting 2 C. Torcia, *Wharton's Criminal Law* § 178, at 296 (14th ed. 1979)). "For battery, as for manslaughter, more is required than ordinary negligence sufficient to support a civil action." *Duckworth, supra,* 323 Md. at 540, 594 A.2d 109 (quoting R. Perkins & R. Boyce, *Criminal Law* 157 (3d ed. 1982)). Consequently, "[s]uch harm is not punishable if it resulted unintentionally from the doing of a lawful act without criminal negligence." R. Perkins, *Criminal Law* 85 (1957). The requisite criminal negligence necessary for conviction of an unintentional battery may be equated to the culpability required for a conviction of involuntary manslaughter (without the death). *See Duckworth, supra,* 323 Md. at 540, 594 A.2d 109; *Lamb v. State*, 93 Md.App. 422, 454–455, 613 A.2d 402 (1992). Thus, whether a defendant's actions constitute gross criminal negligence/recklessness turns on whether those actions under all the circumstances amounted to a disregard of the consequences which might ensue to others. *See State v. Albrecht,* 336 Md. 475, 500, 649 A.2d 336 (1994). More specifically, "[t]he test is whether the [defendant's] misconduct, viewed objectively, was so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe." *Id.* at 501, 649 A.2d 336 (quoting *Minor v. State,* 326 Md. 436, 443, 605 A.2d 138 (1992)).

It is therefore clear that the presence of a specific intent or criminal negligence is a necessary component of the crime of battery and it is the State's burden to prove one or the other

of these elements, and that the contact was non-consensual, to justify a conviction. *See also* the Maryland Criminal Pattern Jury Instructions, delineating the elements of battery, No. 4:04 (1986), cited with approval in *Duckworth, supra,* 323 Md. at 539–40, 594 A.2d 109.[7]

## V

■ The trial judge in this case, in pronouncing the guilty verdict, made no express factual findings as to whether the battery was intentional or unintentional, i.e., one resulting from criminal negligence. He said only that he applied the "appropriate standard" in reaching his verdict. Maryland Rule 4–328 provides that the circuit court, sitting without a jury, "shall render a verdict upon the facts and the law" but is not required to "state the grounds for its decision." *See West v. State,* 312 Md. 197, 539 A.2d 231 (1988); *Pugh v. State,* 271 Md. 701, 319 A.2d 542 (1974). Under Maryland Rule 8–131(c), when an action has been tried, as here, without a jury, the appellate court is required to review the case "on both the law and the evidence." As to legal sufficiency of the evidence to support a conviction, our singular duty is to determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Albrecht, supra,* 336 Md. at 479, 649 A.2d 336 (quoting *Jackson v. Virginia,* 443 U.S. 307, 318–319, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)) (emphasis in original). In this regard, we are enjoined from setting aside the conviction "on the evidence unless clearly erroneous." Maryland Rule 8–131(c). As to our review of the conviction "on the law," we consider whether the guilty verdict was based on a proper application

---

7. The jury instruction states:
   "In order to convict the defendant of battery, the State must prove: (1) that the defendant caused [offensive physical contact with] [physical harm to] *(victim);* (2) that the contact was the result of an intentional or reckless act of the defendant and was not accidental; and (3) that the contact was not legally justified or consented to by *(victim)."*

of the governing law of the State in light of the evidence adduced at the trial.

On the record before us, we are unable to ascertain whether the trial judge, in pronouncing the guilty verdict, based it on evidence supporting the commission of an intentional battery or on·evidence that Dr. Elias's alleged misconduct, while unintended, nevertheless constituted criminal or gross negligence within the principles enunciated in *Duckworth.* The two classes of battery are distinct from one another; they have different proof predicates—the former requiring specific intent as an element of the offense while the latter does not. If Dr. Elias's conviction was grounded on the criminal negligence prong of the crime of battery, we observe no evidence in the record, nor inferences properly to be drawn therefrom, that his actions during the examination of Ms. Hancock, accepting her version of the occurrence, were other than accidental or the result of ordinary negligence, rather than gross criminal negligence. In this regard, Dr. Elias admittedly moved his hands about Ms. Hancock's groin area in quickly feeling her lymph nodes for enlarged glands in an effort to detect the presence of melanoma in her upper thigh area. It is not unexpected that a physician, in conducting such a medical examination, may probe beyond the immediate area of the body to be examined to closely associated areas in order to detect the possibility of a related condition, which might otherwise go unnoticed. It was Ms. Hancock's own testimony that Dr. Elias's touching of her groin/vaginal area by putting his hand beneath her panties was both sudden and fleeting. Because Dr. Elias was earlier acquitted of the fourth degree sexual offense charge (engaging in "sexual contact" with another without consent), his action (assuming its occurrence) in so placing his hand in Ms. Hancock's underwear, was neither sexually motivated nor in pursuit of his own sexual gratification.

That Dr. Elias touched Ms. Hancock's groin/vaginal area without express permission, without wearing gloves, and without a chaperon present, is not, of itself, evidence of criminal negligence in the course of a medical examination. This is

especially so where, as here, there was stipulated evidence that federal regulations required that gloves be worn by physicians only when it was "reasonably anticipated" that a physician may have hand contact with blood or other potentially infectious materials, mucus membranes or non-intact skin. There was no finding by the trial judge, one way or the other, that Dr. Elias violated this regulation, nor that the absence of a chaperon in the circumstances of this case constituted criminal negligence. The evidence before the court that Dr. Elias took Ms. Hancock by surprise when he touched her in a place that she did not anticipate would be involved in the examination, does not, without more, constitute a criminally negligent battery. There was no evidence that the touching was for any purpose other than a proper medical one and thus was legally justified.

As to whether Dr. Elias's conviction was for an intentional battery, we are unable to glean from the record whether the trial judge applied the "appropriate standard," as he said he did, when, in denying Dr. Elias's motion for a judgment of acquittal at the end of the State's case, he stated, as we earlier observed, that because the evidence was that Dr. Elias had "touched" Ms. Hancock's groin/vaginal area, nothing more was required for conviction. Manifestly, if this is what the trial judge meant, then in his view, such an unconsensual touching in the course of a medical examination, without the patient's express consent, was unlawful *per se*, regardless of the circumstances, and without the presence of a specific criminal intent. While trial judges are presumed to know and correctly apply the law, *Gilliam v. State*, 331 Md. 651, 673, 629 A.2d 685 (1993), that presumption does not of itself override the essential requirement of establishing the requisite *mens rea* to support an intentional battery conviction. In so concluding, we again emphasize that the touching was unaccompanied by any sexual purpose. We note in this regard that the State, in its closing argument at the end of the trial, suggested that Dr. Elias's concern that Ms. Hancock might have melanoma was but a pretext "to hide behind whatever it was that he was doing at this time." Such speculation, as we see it, is devoid

of evidentiary support. The record demonstrates that Dr. Elias's concern, which was unrebutted, that Ms. Hancock might have developed melanoma in the groin area was justified by her existing medical history. That Dr. Elias, in the course of his medical examination for melanoma, may have randomly palpated or touched sensitive areas of Ms. Hancock's body without express consent was not, without more, a criminal act motivated by a purpose to intentionally commit a criminal battery. Had there been evidence, or an inference properly derived therefrom, that Dr. Elias's purpose in touching Ms. Hancock's groin/vaginal area was for his own sexual gratification, then a conviction for intentional battery would have been appropriate. This, however, is not the case before us and, consequently, we shall reverse the judgment of the Circuit Court for Baltimore City without a new trial. *See Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

*JUDGMENT REVERSED; COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.*

CHASANOW, Judge, dissenting, in which BELL and RAKER, JJ., join.

A majority of this Court today holds that a doctor performing a physical examination close to an area protected by a female patient's underwear may slip his hands inside her panties, spread the lips of her labia, insert his finger into the opening of her vagina and not be guilty of a battery. This "finding" is made despite the contrary findings of two experienced and capable trial judges who heard all of the evidence and found the doctor guilty and despite the doctor's own acknowledgment that reaching under the patient's underwear and touching her near her vulva would exceed the scope of his medical examination.

This should have been a simple assault and battery case that turned on the issue of credibility. Ms. Hancock, a social worker with an associates degree in human services, a bachelors degree in social work, and a masters degree in social work

was employed by the University of Maryland Medical System. She testified that she gave Dr. Elias permission to perform a medical examination, but he far exceeded the scope of that permission when he reached into her panties, spread her labia, and put his fingers into the opening of her vagina. She also testified that she knew Dr. Elias was not going to do a vaginal examination because he was not wearing rubber gloves. Dr. Elias also acknowledged that he was not performing a vaginal examination of Ms. Hancock and that, if he was going to do what Ms. Hancock claims he did as part of a physical examination, he would have worn rubber gloves and had a nurse present. He emphatically denies putting his hands in Ms. Hancock's underwear or touching her vaginal area. The issue is solely one of credibility, albeit not an easy issue to resolve. Two experienced and respected trial judges each independently observed the witnesses, heard their testimony, and believed Ms. Hancock. This led the judges to the inescapable conclusion that Dr. Elias was guilty of a battery.

It is not clear to me how the majority reaches the conclusion that, as a matter of law, Dr. Elias is not guilty of a battery. Unquestionably this Court must accept the circuit court's finding that an offensive touching occurred. Accepting this finding, as we must do, there are only a limited number of defenses available, none of which were testified to by Dr. Elias, who simply maintained that he didn't do it.

The first defense is consent, either express or implied. Ms. Hancock was emphatic that she gave no consent to Dr. Elias putting his hands beneath her panties and no consent to the offensive touching she described. Dr. Elias never claimed there was consent, either express or implied. He acknowledged that the touching Ms. Hancock described would not have been part of his examination. The trial judge's finding of no consent was not clearly erroneous. The second defense is one seemingly embraced by the majority, *i.e.,* that there was no *intentional* touching. The majority seems to confuse motive with intent and apparently holds that because the motive of sexual gratification may not have been proven, then intent has not been proven. The only intent required for an inten-

tional battery is the intent to touch, and when Dr. Elias reached beneath Ms. Hancock's panties and committed an offensive touching, the trial judge was not clearly erroneous in concluding that he intended to do what he actually did. The third defense, that any touching was accidental rather than as a result of gross criminal negligence, would only be at issue if there was no intentional touching. It must be borne in mind that Dr. Elias never suggested that he may have accidently reached beneath her panties and touched Ms. Hancock. The trial judge could assume that a surgeon would have good hand-eye coordination when performing an exploratory examination with fingers or with a surgical instrument. It would not be clearly erroneous for a trial judge to conclude that a trained surgeon who accidently slips his hands into a patient's panties, accidently spreads the lips of her labia, and accidently puts a finger into the opening of her vagina was at least acting recklessly. Dr. Elias asserted no defense other than he didn't touch Ms. Hancock where she said he touched her. I cannot join in the majority's attempts to create an unasserted, unsubstantiated defense.

In reaching the conclusion that Dr. Elias is not guilty as a matter of law, I trust the majority is only revising the factfinding in the instant case and not revising the law of assault and battery. What I trust this case does not stand for is the absurd proposition that a physician, a masseuse, or any other person who may have permission to touch a woman near an intimate area of her body may reach beneath her underwear and fondle her with impunity. I expect that this case will be recognized for what it is, *a sui generis* decision limited to its own peculiar facts.

BELL and RAKER, JJ., join in this dissenting opinion.